KAVANAUGH, Circuit Judge:
This case raises significant questions about the scope of the Executive’s authority to disregard federal statutes. The case arises out of a longstanding dispute about nuclear waste storage at Yucca Mountain in Nevada. The underlying policy debate is not our concern. The policy is for Congress and the President to establish as they see fit in enacting statutes, and for the President and subordinate executive agencies (as well as relevant independent agencies such as the Nuclear Regulatory Commission) to implement within statutory boundaries. Our more modest task is to ensure, in justiciable cases, that agencies comply with the law as it has been set by Congress. Here, the Nuclear Regulatory Commission has continued to violate the law governing the Yucca Mountain licensing process. We therefore grant the petition for a writ of mandamus.
I
This case involves the Nuclear Waste Policy Act, which was passed by Congress and then signed by President Reagan in 1983. That law provides that the Nuclear Regulatory Commission “shall consider” the Department of Energy’s license application to store nuclear waste at Yucca Mountain and “shall issue a final decision approving or disapproving” the application within three years of its submission. 42 U.S.C. § 10134(d). The statute allows the Commission to extend the deadline by an additional year if it issues a written report *258 explaining the reason for the delay and providing the estimated time for completion. Id. § 10134(d), (e)(2).
In June 2008, the Department of Energy submitted its license application to the Nuclear Regulatory Commission. As recently as Fiscal Year 2011, Congress appropriated funds to the Commission so that the Commission could conduct the statutorily mandated licensing process. Importantly, the Commission has at least $11.1 million in appropriated funds to continue consideration of the license application.
But the statutory deadline for the Commission to complete the licensing process and approve or disapprove the Department of Energy’s application has long since passed. Yet the Commission still has not issued the decision required by statute. Indeed, by its own admission, the Commission has no current intention of complying with the law. Rather, the Commission has simply shut down its review and consideration of the Department of Energy’s license application.
Petitioners include the States of South Carolina and Washington, as well as entities and individuals in those States. Nuclear waste is currently stored in those States in the absence of a long-term storage site such as Yucca Mountain.
Since 2010, petitioners have sought a writ of mandamus requiring the Commission to comply with the law and to resume processing the Department of Energy’s pending license application for Yucca Mountain. Mandamus is an extraordinary remedy that takes account of equitable considerations. The writ may be granted “to correct transparent violations of a clear duty to act.” In re American Rivers and Idaho Rivers United, 372 F.3d 413, 418 (D.C.Cir.2004) (internal quotation marks omitted); see also Arizona v. Inter Tribal Council of Arizona, Inc., — U.S.-, 133 S.Ct. 2247, 2260 n. 10, 186 L.Ed.2d 239 (2013) (noting that if the federal Election Assistance Commission did not act on a state’s statutorily permitted request, “Arizona would be free to seek a writ of mandamus to ‘compel agency action unlawfully withheld or unreasonably delayed’ ”) (quoting 5 U.S.C. § 706(1)).
In 2011, a prior panel of this Court indicated that, if the Commission failed to act on the Department of Energy’s license application within the deadlines specified by the Nuclear Waste Policy Act, mandamus likely would be appropriate. See In re Aiken County, 645 F.3d 428, 436 (D.C.Cir.2011). In 2012, after a new mandamus petition had been filed, this panel issued an order holding the case in abeyance and directing that the parties file status updates regarding Fiscal Year 2013 appropriations. At that time, we did not issue the writ of mandamus. Instead, in light of the Commission’s strenuous claims that Congress did not want the licensing process to continue and the equitable considerations appropriately taken into account in mandamus cases, we allowed time for Congress to clarify this issue if it wished to do so. But a majority of the Court also made clear that, given the current statutory language and the funds available to the Commission, the Commission was violating federal law'by declining to further process the license application. And the Court’s majority further indicated that the mandamus petition eventually would have to be granted if the Commission did not act or Congress did not enact new legislation either terminating the Commission’s licensing process or otherwise making clear that the Commission may not expend funds on the licensing process. See Order, In re Aiken County, No. 11-1271, 2012 WL 3140360 (D.C.Cir. Aug. 3, 2012).
*259 Since we issued that order more than a year ago on August 3, 2012, the Commission has not acted, and Congress has not altered the legal landscape. As things stand, therefore, the Commission is simply flouting the law. In light of the constitutional respect owed to Congress, and having fully exhausted the alternatives available to us, we now grant the petition for writ of mandamus against the Nuclear Regulatory Commission.
II
Our analysis begins with settled, bedrock principles of constitutional law. Under Article II of the Constitution and relevant Supreme Court precedents, the President must follow statutory mandates so long as there is appropriated money available and the President has no constitutional objection to the statute. So, too, the President must abide by statutory prohibitions unless the President has a constitutional objection to the prohibition. If the President has a constitutional objection to a statutory mandate or prohibition, the President may decline to follow the law unless and until a final Court order dictates otherwise. But the President may not decline to follow a statutory mandate or prohibition simply because of policy objections. Of course, if Congress appropriates no money for a statutorily mandated program, the Executive obviously cannot move forward. But absent a lack of funds or a claim of unconstitutionality that has not been rejected by final Court order, the Executive must abide by statutory mandates and prohibitions.
Those basic constitutional principles apply to the President and subordinate executive agencies. And they apply at least as much to independent agencies such as the Nuclear Regulatory Commission. Cf. FCC v. Fox Television Stations, Inc., 556 U.S. 502, 525-26, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009) (opinion of Scalia, J., for four Justices) (independent agency should be subject to same scrutiny as executive agencies); id. at 547, 129 S.Ct. 1800 (opinion of Breyer, J., for four Justices) (independent agency’s “comparative freedom from ballot-box control makes it all the more important that courts review its decisionmaking to assure compliance with applicable provisions of the law”).
In this case, however, the Nuclear Regulatory Commission has declined to continue the statutorily mandated Yucca Mountain licensing process. Several justifications have been suggested in support of the Commission’s actions in this case. None is persuasive.
First, the Commission claims that Congress has not yet appropriated the full amount of funding necessary for the Commission to complete the licensing proceeding. But Congress often appropriates money on a step-by-step basis, especially for long-term projects. Federal agencies may not ignore statutory mandates simply because Congress has not yet appropriated all of the money necessary to complete a project. See City of Los Angeles v. Adams, 556 F.2d 40, 50 (D.C.Cir.1977) (when statutory mandate is not fully funded, “the agency administering the statute is required to effectuate the original statutory scheme as much as possible, within the limits of the added constraint”). For present purposes, the key point is this: The Commission is under a legal obligation to continue the licensing process, and it has at least $11.1 million in appropriated funds—a significant amount of money—to do so. See Commission Third Status Report, at 2 (Apr. 5, 2013).
Second, and relatedly, the Commission speculates that Congress, in the future, will not appropriate the additional funds necessary for the Commission to *260 complete the licensing process. So it would be a waste, the Commission theorizes, to continue to conduct the process now. The Commission’s political prognostication may or may not ultimately prove to be correct. Regardless, an agency may not rely on political guesswork about future congressional appropriations as a basis for violating existing legal mandates. A judicial green light for such a step—allowing agencies to ignore statutory mandates and prohibitions based on agency speculation about future congressional action—would gravely upset the balance of powers between the Branches and represent a major and unwarranted expansion of the Executive’s power at the expense of Congress.
Third, the Commission points to Congress’s recent appropriations to the Commission and to the Department of Energy for the Yucca Mountain project. In the last three years, those appropriations have been relatively low or zero. The Commission argues that those appropriations levels demonstrate a congressional desire for the Commission to shut down the licensing process.
But Congress speaks through the laws it enacts. No law states that the Commission should decline to spend previously appropriated funds on the licensing process. No law states that the Commission should shut down the licensing process. And the fact that Congress hasn’t yet made additional appropriations over the existing $11.1 million available to the Commission to continue the licensing process tells us nothing definitive about what a future Congress may do. As the Supreme Court has explained, courts generally should not infer that Congress has implicitly repealed or suspended statutory mandates based simply on the amount of money Congress has appropriated. See TVA v. Hill, 437 U.S. 153, 190, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (doctrine that repeals by implication are disfavored “applies with even greater force when the claimed repeal rests solely on an Appropriations Act”); United States v. Langston, 118 U.S. 389, 394, 21 Ct.Cl. 506, 6 S.Ct. 1185, 30 L.Ed. 164 (1886) (“a statute fixing the annual salary of a public officer at a named sum ... should not be deemed abrogated or suspended by subsequent enactments which merely appropriated a less amount for the services of that officer for particular fiscal years”); cf. 1 GAO, Principles of Federal Appropriations Law at 2^49 (3d ed.2004) (“a mere failure to appropriate sufficient funds will not be construed as amending or repealing prior authorizing legislation”).
In these circumstances, where previously appropriated money is available for an agency to perform a statutorily mandated activity, we see no basis for a court to excuse the agency from that statutory mandate.
Fourth, the record suggests that the Commission, as a policy matter, simply may not want to pursue Yucca Mountain as a possible site for storage of nuclear waste. But Congress sets the policy, not the Commission. And policy disagreement with Congress’s decision about nuclear waste storage is not a lawful ground for the Commission to decline to continue the congressionally mandated licensing process. To reiterate, the President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress. See Lincoln v. Vigil, 508 U.S. 182, 193, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) (“Of course, an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes.... ”); 18 Comp. Gen. 285, 292 (1938) (“the question with the accounting officers is not the *261 apparent general merit of a proposed expenditure, but whether the Congress, controlling the purse, has by law authorized the expenditure”).[1]
Ill[2]
We thus far have concluded that the Commission’s inaction violates the Nuclear Waste Policy Act. To be sure, there are also two principles rooted in Article II of the Constitution that give the Executive authority, in certain circumstances, to decline to act in the face of a clear statute. But neither of those principles applies here.
First, the President possesses significant independent authority to assess the constitutionality of a statute. See U.S. Const, art. II, § 1, cl. 1 (Executive Power Clause); U.S. Const, art. II, § 1, cl. 8 (Oath of Office Clause); U.S. Const, art. II, § 3 (Take Care Clause). But that principle does not help the Commission.
To explain: The President is of course not bound by Congress’s assessment of the constitutionality of a statute. The Take Care Clause of Article II refers to “Laws,” and those Laws include the Constitution, which is superior to statutes. See U.S. Const, art. VI (Constitution is “supreme Law of the Land”). So, too, Congress is not bound by the President’s assessment of the constitutionality of a statute. Rather, in a justiciable ease, the Supreme Court has the final word on whether a statutory mandate or prohibition on the Executive is constitutional. See Nixon v. Administrator of General Services, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (Presidential Recordings and Materials Preservation Act is constitutional); see also Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 639, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring) (congressional statutes that together preclude President from seizing steel mills are constitutional); see generally Marbury v. Madison, 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803).
So unless and until a final Court decision in a justiciable case says that a statutory mandate or prohibition on the Executive Branch is constitutional, the President (and subordinate executive agencies supervised and directed by the President) may decline to follow that statutory mandate or prohibition if the President concludes that it is unconstitutional. Presidents routinely exercise this power through Presidential directives, executive orders, signing statements, and other forms of Presidential decisions. See, e.g., Zivotofsky v. Clinton, — U.S.-, 132 S.Ct. 1421, 182 L.Ed.2d 423 (2012) (based on Article II, Presidents Bush and Obama refused to comply with *262 statute regulating passports of individuals born in Jerusalem); Myers v. United States, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926) (based on Article II, President Wilson refused to comply with statutory limit on the President’s removal power); see also Freytag v. Commissioner of Internal Revenue, 501 U.S. 868, 906, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (Scalia, J., concurring) (President has “the power to veto encroaching laws or even to disregard them when they are unconstitutional”) (citation omitted); Presidential Authority to Decline to Execute Unconstitutional Statutes, 18 Op. Off. Legal Counsel 199, 199-200 (1994) (Walter Dellinger) (describing as “uncontroversial” and “unassailable” the proposition that a President may decline to execute an unconstitutional statute in some circumstances); 2 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 446 (Jonathan Elliot ed., 2d ed. 1836) (“the President of the United States could shield himself, and refuse to carry into effect an act that violates the Constitution”) (statement of James Wilson).[3]
But even assuming arguendo that an independent agency such as the Nuclear Regulatory Commission possesses Article II authority to assess the constitutionality of a statute and thus may decline to follow the statute until a final Court order says otherwise,[4] the Commission has not asserted that the relevant statutes in this case are unconstitutional. So that Article II principle is of no help to the Commission here.
Second, it is also true that, under Article II, the President possesses a significant degree of prosecutorial discretion not to take enforcement actions against violators of a federal law. But that principle does not support the Commission’s inaction here. To demonstrate why, the contours of the Executive’s prosecutorial discretion must be explained.
The Presidential power of prosecutorial discretion is rooted in Article II, including the Executive Power Clause, the Take Care Clause, the Oath of Office Clause, and the Pardon Clause. See U.S. Const. *263 art. II, § 1, cl. 1 (Executive Power Clause); U.S. Const, art. II, § 1, cl. 8 (Oath of Office Clause); U.S. Const, art. II, § 2, cl. 1 (Pardon Clause); U.S. Const, art. II, § 3 (Take Care Clause); see also U.S. Const. art. I, § 9, cl. 3 (Bill of Attainder Clause). The President may decline to prosecute certain violators of federal law just as the President may pardon certain violators of federal law.[5] The President may decline to prosecute or may pardon because of the President’s own constitutional concerns about a law or because of policy objections to the law, among other reasons.[6] See, e.g., United States v. Nixon, 418 U.S. 683, 693, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (“the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case”); Community for Creative Non-Violence v. Pierce, 786 F.2d 1199, 1201 (D.C.Cir.1986) (“The power to decide when to investigate, and when to prosecute, lies at the core of the Executive’s duty to see to the faithful execution of the laws.... ”); United States v. Cox, 342 F.2d 167,171 (5th Cir.1965) (“The discretionary power of the attorney for the United States in determining whether a prosecution shall be commenced or maintained may well depend upon matters of policy wholly apart from any question of probable cause.”); Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege, 8 Op. Off. Legal Counsel 101, 125 (1984) (Theodore B. Olson) (“the constitutionally prescribed separation of powers requires that the Executive retain discretion with respect to whom it will prosecute for violations of the law”); id. at 115 (“The Executive’s exclusive authority to prosecute violations of the law gives rise to the corollary that neither the Judicial nor Legislative Branches may directly interfere with the prosecutorial discretion of the Executive by directing the Executive Branch to prosecute particular individuals.”); Congressman John Marshall, Speech to the House of Representatives (1800), reprinted in 18 U.S. app. at 29 (1820) (The President may “direct that the criminal be prosecuted no further. This is ... the exercise of an indubitable and a constitutional power.”); see also United States v. Klein, 80 U.S. 128, 147, 13 Wall. 128, 20 L.Ed. 519 (1871) (“To the executive alone is intrusted the power of pardon; and it is granted without limit.”).
In light of the President’s Article II prosecutorial discretion, Congress may not mandate that the President prosecute a certain kind of offense or offender. The logic behind the pardon power further supports that conclusion. As has been settled since the Founding, the President has absolute authority to issue a pardon at any time after an unlawful act has occurred, even before a charge or trial. See Ex parte Grossman, 267 U.S. 87, 120, 45 S.Ct. 332, 69 L.Ed. 527 (1925) (“The Executive can reprieve or pardon all offenses after their commission, either before trial, during trial or after trial, by individuals, or by classes.... ”). So it would make little sense to think that Congress constitutionally could compel the President to prosecute certain offenses or offenders, given that the President has undisputed authori *264 ty to pardon all such offenders at any time after commission of the offense. See Akhil Reed Amar, America’s Constitution: A Biography 179 (2005) (“greater power to pardon subsumed the lesser power to simply decline prosecution”).[7]
The Executive’s broad prosecutorial discretion and pardon powers illustrate a key point of the Constitution’s separation of powers. One of the greatest unilateral powers a President possesses under the Constitution, at least in the domestic sphere, is the power to protect individual liberty by essentially under-enforcing federal statutes regulating private behavior— more precisely, the power either not to seek charges against violators of a federal law or to pardon violators of a federal law.[8] The Framers saw the separation of the power to prosecute from the power to legislate as essential to preserving individual liberty. See The Federalist No. 47, at 269 (James Madison) (Clinton Rossiter ed., rev. ed. 1999) (“The accumulation of all powers, legislative, executive, and judiciary, in the same hands ... may justly be pronounced the very definition of tyranny.”); 1 Montesquieu, The Spirit of Laws bk. 11, Ah. 6, at 163 (Thomas Nugent trans., 1914) (“When the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner.”). After enacting a statute, Congress may not mandate the prosecution of violators of that statute. Instead, the President’s prosecutorial discretion and pardon powers operate as an independent protection for individual citizens against the enforcement of oppressive laws that Congress may have passed (and still further protection comes from later review by an independent jury and Judiciary in those prosecutions brought by the Executive).[9]
*265 To be sure, a President’s decision to exercise prosecutorial discretion and to decline to seek charges against violators (or to pardon violators) of certain laws can be very controversial. For example, if a President disagreed on constitutional or policy grounds with certain federal marijuana or gun possession laws and said that the Executive Branch would not initiate criminal charges against violators of those laws, controversy might well ensue, including public criticism that the President was “ignoring” or “failing to enforce” the law (and if a court had previously upheld the law in question as constitutional, additional claims that the President was also “ignoring” the courts). But the President has clear constitutional authority to exercise prosecutorial discretion to decline to prosecute violators of such laws, just as the President indisputably has clear constitutional authority to pardon violators of such laws. See, e.g., 1963 Attorney Gen. Ann. Rep. 62, 62-63 (1963) (President Kennedy commuted the sentences of many drug offenders sentenced to mandatory minimums); Letter from Thomas Jefferson to Abigail Adams (July 22, 1804), in 11 The Writings of Thomas Jefferson 42, 43-44 (Andrew A. Lipscomb & Albert Ellery Bergh eds., 1904) (President Jefferson both pardoned those convicted under the Sedition Act and refused to prosecute violators of the Act); President George 18 Washington, Proclamation (July 10, 1795), in 1 A Compilation of the Messages and Papers of the Presidents 1789-1897, at 181 (James D. Richardson ed., 1896) (President Washington pardoned participants in the Pennsylvania Whiskey Rebellion).[10] *266 The remedy for Presidential abuses of the power to pardon or to decline to prosecute comes in the form of public disapproval, congressional “retaliation” on other matters, or ultimately impeachment in eases of extreme abuse.
So having said all of that, why doesn’t the principle of prosecutorial discretion justify the Nuclear Regulatory Commission’s inaction in this case? The answer is straightforward. Prosecutorial discretion encompasses the Executive’s power to decide whether to initiate charges for legal wrongdoing and to seek punishment, penalties, or sanctions against individuals or entities who violate federal law. Prosecutorial discretion does not include the power to disregard other statutory obligations that apply to the Executive Branch, such as statutory requirements to issue rules, see Massachusetts v. EPA, 549 U.S. 497, 527-28, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) (explaining the difference), or to pay benefits, or to implement or administer statutory projects or programs. Put another way, prosecutorial discretion encompasses the discretion not to enforce a law against private parties; it does not encompass the discretion not to follow a law imposing a mandate or prohibition on the Executive Branch.[11]
This case does not involve a Commission decision not to prosecute violations of federal law. Rather, this case involves a Commission decision not to follow a law mandating that the Commission take certain non-prosecutorial action. So the Executive’s power of prosecutorial discretion provides no support for the Commission’s inaction and disregard of federal law here.
IV
At the behest of the Commission, we have repeatedly gone out of our way over the last several years to defer a mandamus order against the Commission and thereby give Congress time to pass new legislation that would clarify this matter if it so wished. In our decision in August 2012, the Court’s majority made clear, however, that mandamus likely would have to be granted at some point if Congress took no further action. See Order, In re Aiken County, No. 11-1271, 2012 WL 3140360 (D.C.Cir. Aug. 3, 2012). Since then, Congress has taken no further action on this matter. At this point, the Commission is simply defying a law enacted by Congress, and the Commission is doing so without any legal basis.
We therefore have no good choice but to grant the petition for a writ of mandamus against the Commission.[12] This case has *267 serious implications for our constitutional structure. It is no overstatement to say that our constitutional system of separation of powers would be significantly altered if we were to allow executive and independent agencies to disregard federal law in the manner asserted in this ease by the Nuclear Regulatory Commission. Our decision today rests on the constitutional authority of Congress, and the respect that the Executive and the Judiciary properly owe to Congress in the circumstances here. To be sure, if Congress determines in the wake of our decision that it will never fund the Commission’s licensing process to completion, we would certainly hope that Congress would step in before the current $11.1 million is expended, so as to avoid wasting that taxpayer money. And Congress, of course, is under no obligation to appropriate additional money for the Yucca Mountain project. Moreover, our decision here does not prejudge the merits of the Commission’s consideration or decision on the Department of Energy’s license application, or the Commission’s consideration or decision on any Department of Energy attempt to withdraw the license application. But unless and until Congress authoritatively says otherwise or there are no appropriated funds remaining, the Nuclear Regulatory Commission must promptly continue with the legally mandated licensing process. The petition for a writ of mandamus is granted.

So ordered.

. Like the Commission here, a President sometimes has policy reasons (as distinct from constitutional reasons, cf. infra note 3) for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds. Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill. See 2 U.S.C. § 683; see also Train v. City of New York, 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975); Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, to Edward L. Morgan, Deputy Counsel to the President (Dec. 1, 1969), reprinted in Executive Impoundment of Appropriated Funds: Hearings Before the Subcomm. on Separation of Powers of the S. Comm, on the Judiciary, 92d Cong. 279, 282 (1971) (“With respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent.”).

. Judge Kavanaugh alone joins Part III of the opinion.

. In declining to follow a statutory mandate that the President independently concludes is unconstitutional, the President generally may decline to expend funds on that unconstitutional program, at least unless and until a final Court order rules otherwise. But in declining to follow a statutory prohibition that the President independently concludes is unconstitutional (and not just unwise policy, cf. supra note 1), the Appropriations Clause acts as a separate limit on the President’s power. It is thus doubtful that the President may permissibly expend more funds than Congress has appropriated for the program in question. See U.S. Const, art. I, § 9, cl. 7 (Appropriations Clause); see also OPM v. Richmond, 496 U.S. 414, 425, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990) ("Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury.”). It is sometimes suggested, however, that the President may elect not to follow a statutory prohibition on how otherwise available appropriated funds are spent if the President concludes that the prohibition is unconstitutional, at least unless and until a final Court order rules otherwise. See David J. Barron & Martin S. Lederman, The Commander in Chief at the Lowest Ebb— Framing the Problem, Doctrine, and Original Understanding, 121 Harv. L.Rev. 689, 740 (2008). This case does not require analysis of those difficult questions.

. It is doubtful that an independent agency may disregard a statute on constitutional grounds unless the President has concluded that the relevant statute is unconstitutional. But we need not delve further into that question here. Compare Humphrey’s Executor v. United States, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935), with Myers, 272 U.S. 52, 47 S.Ct. 21, and Free Enteiprise Fund v. Public Company Accounting Oversight Board,U.S. -, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010).

. The power to pardon encompasses the power to commute sentences. See Schick v. Reed, 419 U.S. 256, 264, 95 S.Ct. 379, 42 L.Ed.2d 430 (1974).

. One important difference between a decision not to prosecute and a pardon is that a pardon prevents a future President from prosecuting the offender for that offense. Prosecutorial discretion, meanwhile, might be exercised differently by a future President—subject to statute of limitations issues or any due process limits that might apply when an offender has reasonably relied on a prior Presidential promise not to prosecute particular conduct.

. If the Executive selectively prosecutes someone based on impermissible considerations, the equal protection remedy is to dismiss the prosecution, not to compel the Executive to bring another prosecution. See United States v. Armstrong, 517 U.S. 456, 459, 463, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996); Yick Wo v. Hopkins, 118 U.S. 356, 373-74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); cf. Linda R.S. v. Richard D., 410 U.S. 614, 618-19, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973).

. Congress obviously has tools to deter the Executive from exercising authority in this way—for example by using the appropriations power or the advice and consent power to thwart other aspects of the Executive’s agenda (and ultimately, of course, Congress has the impeachment power). But Congress may not overturn a pardon or direct that the Executive prosecute a particular individual or class of individuals.

. It is likely that the Executive may decline to seek civil penalties or sanctions (including penalties or sanctions in administrative proceedings) on behalf of the Federal Government in the same way. Because they are to some extent analogous to criminal prosecution decisions and stem from similar Article II roots, such civil enforcement decisions brought by the Federal Government are presumptively an exclusive Executive power. See Buckley v. Valeo, 424 U.S. 1, 138, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ("The Commission's enforcement power, exemplified by its discretionary power to seek judicial relief, is authority that cannot possibly be regarded as merely in aid of the legislative function of Congress. A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.’ ”) (quoting U.S. Const, art. II, § 3); Heckler v. Chaney, 470 U.S. 821, 831-33, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985); Confiscation Cases, 74 U.S. 454, 457, 7 Wall. 454, 19 L.Ed. 196 (1868); see also Butz v. Economou, 438 U.S. 478, 515, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); Seven-Sky v. Holder, 661 F.3d 1, 50 & n. 43 (D.C.Cir.2011) (Kavanaugh, L, dissenting) (referring to possibility that a President might exercise prosecutorial discretion not to seek civil penalties against violators of a stat *265 ute). That said, it has occasionally been posited that the President’s power not to initiate a civil enforcement action may not be entirely absolute (unlike with respect to criminal prosecution) and thus might yield if Congress expressly mandates civil enforcement actions in certain circumstances. Cf. Heckler, 470 U.S. at 832-33, 105 S.Ct. 1649.

. As a general matter, there is widespread confusion about the differences between (i) the President’s authority to disregard statutory mandates or prohibitions on the Executive, based on the President’s constitutional objections, and (ii) the President's prosecutorial discretion not to initiate charges against (or to pardon) violators of a federal law. There are two key practical differences. First, the President may disregard a statutory mandate or prohibition on the Executive only on constitutional grounds, not on policy grounds. By contrast, the President may exercise the prosecutorial discretion and pardon powers on any ground—whether based on the Constitution, policy, or other considerations. Second, our constitutional structure and tradition establish that a President is bound to comply with a final Court decision holding that a statutory mandate or prohibition on the Executive is constitutional. But in the prosecutorial discretion and pardon context, when a Court upholds a statute that regulates private parties as consistent with the Constitution, that ruling simply authorizes prosecution of violators of that law. Such a Court ruling does not require the President either to prosecute violators of that law or to refrain from pardoning violators of that law. So the President may decline to prosecute or may pardon violators of a law that the Court has upheld as constitutional. To take one example, a President plainly could choose not to seek (or could commute) federal death sentences because of the President’s own objections to the death penalty, even though the Supreme Court has upheld the death penalty as constitutional. See Daniel J. Meltzer, Executive Defense of Congressional Acts, 61 Duke L.J. 1183, 1189-90 (2012) ("President Jefferson ended pending prosecutions under the Sedition Act and pardoned individuals previously convicted under that Act, even though the courts had upheld the Act’s constitutionality.... [I]t can hardly be said that his pardons disregarded a duty to enforce or defend a congressional statute, given that the pardon power, by its nature, involves undoing the prior enforcement, via conviction, of a statute. And although the abatement of pending prosecutions failed in one sense to enforce the Sedition Act, given the breadth of prosecutorial discretion—whether rooted in the Constitution, in the presumed intention of Congress, or in some combination of the two—it is hard to view Jefferson as having *266 disregarded a congressional mandate.”) (footnotes omitted).

. Of course, for reasons already discussed, the President may decline to follow a law that purports to require the Executive Branch to prosecute certain offenses or offenders. Such a law would interfere with the President’s Article II prosecutorial discretion.

. In his dissent, Chief Judge Garland cites several cases to explain his vote against granting mandamus in this case. Of the eight cases he cites, however, five did not involve a statutory mandate with a defined deadline, as we have here. In the other three cases, the Court made clear that either the agency had to act or the Court would grant mandamus in the future. See In re United Mine Workers of America International Union, 190 F.3d 545, 554 (D.C.Cir.1999) ("however modest [an agency's] personnel and budgetary resources may be, there is a limit to how long it may use these justifications to excuse inaction”); Grand Canyon Air Tour Coalition v. FAA, 154 F.3d 455, 477 (D.C.Cir. 1998) (denying mandamus partly because "this is not a case where an agency has been contumacious in ignoring court directions to expedite decision-making”); In re Barr Laboratories, Inc., 930 F.2d 72, 76 (D.C.Cir.1991) (mandamus inappropriate where it would interfere with agency priorities set by applying agency expertise but noting that "[w]here the agency has mani *267 fested bad faith, as by ... asserting utter indifference to a congressional deadline, the agency will have a hard time claiming legitimacy for its priorities”). Consistent with those precedents, we followed a cautious approach in our decision more than a year ago when we declined to issue mandamus against the Commission at that time. But the Court’s majority clearly warned that mandamus would eventually have to be granted if the Commission did not act or if Congress did not change the law. Since then, despite the clear warning, the Commission has still not complied with the statutory mandate. On the contrary, the Commission has reaffirmed that it has no plans to comply with the statutory mandate. In the face of such deliberate and continued agency disregard of a statutory mandate, our precedents strongly support a writ of mandamus. Our respectful factbound difference with Chief Judge Garland, then, is simply that we believe—especially given the Court’s cautious and incremental approach in prior iterations of this litigation, the significant amount of money available for the Commission to continue the licensing process, and the Commission's continued disregard of the law—that the case has by now proceeded to the point where mandamus appropriately must be granted.