# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 15, 2019         Decided May 28, 2019

No. 18-5150

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON
AND NATIONAL SECURITY ARCHIVE,
APPELLANTS

v.

DONALD J. TRUMP, THE HONORABLE, PRESIDENT OF THE
UNITED STATES OF AMERICA AND EXECUTIVE OFFICE OF THE
PRESIDENT OF THE UNITED STATES,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-01228)

*George M. Clarke III* argued the cause for appellants.
With him on the briefs was *Anne L. Weismann*.

*Mark B. Stern*, Attorney, U.S. Department of Justice,
argued the cause for appellees. With him on the brief was *Abby
C. Wright*, Attorney.

Before: TATEL and PILLARD, *Circuit Judges*, and
EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Shortly after President Trump took office, the press reported that White House personnel were communicating over messaging apps that, unlike standard text messaging platforms that preserve conversations, automatically delete messages once read. Alleging that the use of such apps violates the Presidential Records Act (PRA), which requires the preservation of official presidential records, Citizens for Responsibility and Ethics in Washington and the National Security Archive (collectively, "CREW") sued, seeking a writ of mandamus prohibiting the use of such apps and requiring the White House to issue guidelines to ensure compliance with the PRA. The district court denied the writ, and we affirm. As explained below, CREW has failed to establish the most fundamental element of mandamus: a clear and indisputable right to relief.

## I.

Enacted in the wake of Watergate and the ensuing struggle over Congress's authority to access former-President Nixon's records, the Presidential Records Act "establish[es] the public ownership of records created by . . . presidents and their staffs in the course of discharging their official duties." H.R. Rep. No. 95-1487, 95th Cong. at 2 (1978). Although the PRA makes clear that the United States "retain[s] complete ownership, possession, and control of Presidential records," 44 U.S.C. § 2202, it also provides that the President, during his term in office, shall assume "exclusive[] responsib[ility] for custody, control, and access to such Presidential records," *id.* § 2203(f). The PRA sets out three basic requirements for the handling of presidential records during a president's tenure.

First, the Act requires that records "shall, to the extent practicable, be categorized as Presidential records or personal

records upon their creation or receipt and be filed separately." *Id.* § 2203(b). The PRA defines "[p]residential records" broadly to include all "documentary materials" "created or received by the President," his staff, and his advisors "in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." *Id.* § 2201(2).

Second, the statute regulates the disposal of presidential records. "[T]he President may dispose of . . . records . . . that no longer have administrative, historical, informational, or evidentiary value," but only after "obtain[ing] the views, in writing, of the Archivist." *Id.* § 2203(c). The Archivist may seek Congress's advice on the proposed disposal if he believes that doing so "is in the public interest." *Id.* § 2203(e). Disposal decisions matter because presidential records—if not previously discarded, that is—become available for public release several years after a president leaves office. *See id.* § 2204(b)(2) (providing that "[a]ny such record which does not contain [statutorily exempted] information" shall be publicly available pursuant to the relevant Freedom of Information Act (FOIA) provisions "5 years after the date on which the Archivist obtains custody of such record").

Third, the PRA directs the President, "[t]hrough the implementation of records management controls and other necessary actions," to "take all such steps as may be necessary to assure that [presidential] activities . . . are adequately documented and that such records are preserved and maintained as Presidential records." *Id.* § 2203(a).

Richard Nixon could only have dreamed of the technology at issue in this case: message-deleting apps that guarantee confidentiality by encrypting messages and then erasing them forever once read by the recipient. Such apps, according to an

article appearing in the *Wall Street Journal* just four days after President Trump's inauguration, were being used by White House staff "to communicate with each other about presidential or federal business." Complaint for Declaratory, Injunctive, and Mandamus Relief ¶ 50 (citing Mara Gay, *Messaging App Has Bipartisan Support Amid Hacking Concerns*, Wall Street Journal (Jan. 24, 2017), https://www.wsj.com/articles/messaging-app-has-bipartisan-support-amid-hacking-concerns-1485215028); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("accept[ing] all factual allegations in the complaint as true" at the motion-to-dismiss stage).

This and other similar accounts piqued the interest of several members of the Oversight and Government Reform Committee of the U.S. House of Representatives, who sent a letter to White House Counsel expressing their concern that the use of message-deleting apps "could result in the creation of presidential or federal records that would be unlikely or impossible to preserve." Letter from Jason Chaffetz, Chairman & Elijah E. Cummings, House Oversight Committee to Donald McGahn, Counsel to the President 2 (Mar. 8, 2017). They asked Counsel to "[i]dentify policies and procedures currently in place to ensure all communications related to the creation or transmission of presidential records . . . are . . . preserved as presidential records." *Id.* at 3. In response, a White House official assured the members that the President was "committed to preserving records of activities" relating to his "constitutional, statutory or other official or ceremonial duties." Letter from Marc T. Short, Assistant to the President to Jason Chaffetz & Elijah E. Cummings, House Oversight Committee 1 (Apr. 11, 2017) ("Short Letter"). "All White House employees," the official added, "have been trained on their responsibilities under the PRA," *id.* at 1, and the Office of the Counsel to the President "provides written guidance to inform employees of PRA requirements," *id.* at 2.

Though it was not public at the time, in February 2017, as press attention to the messaging practice spread and before this lawsuit commenced, White House Counsel circulated an internal memo describing the staff's PRA obligations ("February 2017 Memo"). *See generally* Memorandum for All Personnel Regarding Presidential Records Act Obligations (Feb. 22, 2017), https://go.usa.gov/xEckn (National Archives). Subsequently released pursuant to the Freedom of Information Act, the Memo prohibits the use of "instant messaging systems . . . or other internet-based means of electronic communication to conduct official business," and directs White House personnel to "conduct all work-related communications on [their] official . . . email account[s]" and to "preserve electronic communications that are presidential records." *Id.* at 2–3. On the same day the Memo issued, White House Counsel sent a "Compliance Reminder Email" advising staff that the "[u]se of . . . messaging apps (such as Snapchat, Confide, Slack or others) . . . is not permitted" for any "work-related communications." *See* Email from White House Counsel at 2 (Feb. 22, 2017), https://www.archives.gov/files/foia/Passantino%20Email%201%20of%202_redacted.pdf (National Archives).

The House Oversight Committee was not the only group troubled by the White House's use of message-deleting apps. Alleging that "White House staff who use such apps cannot be in compliance with the PRA," Appellants' Br. 29, CREW sued, seeking a writ of mandamus compelling the president and the Executive Office (collectively, the "White House") to comply with their ostensibly "non-discretionary duties" under the statute: to categorize records as presidential or personal; to follow certain procedures, including notifying the Archivist, before disposing of records; and to implement record management guidelines. *See generally Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996) (explaining that to qualify for

mandamus relief a plaintiff must identify a non-discretionary or "ministerial" duty). CREW also sought a declaration that the White House's knowing use of message-deleting apps and its failure to issue guidelines concerning such apps violate the PRA.

The district court, focusing only on the duty to implement record management guidelines, concluded that nothing in the PRA "obligates the President to perform any duty with the requisite level of specificity that mandamus requires." *Citizens for Responsibility & Ethics in Washington v. Trump*, 302 F. Supp. 3d 127, 136 (D.D.C. 2018). Because CREW had therefore "failed to state a valid mandamus claim," the court granted the White House's motion to dismiss. *Id.* at 137.

CREW moved to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e), pointing out that the district court had not addressed whether the use of message-deleting apps violated the other two duties identified in the complaint (records categorization and pre-disposal notification). The court denied the motion. Finding that CREW had failed to develop those arguments in the complaint and opposition to the motion to dismiss, the court concluded that "CREW forfeited its arguments that either of the two duties it now points to . . . are ministerial duties supporting a mandamus claim." *Citizens for Responsibility & Ethics in Washington v. Trump*, No. 17-1228, slip op. at 2 (D.D.C. June 25, 2018). And even if not forfeited, the district court explained, those arguments were "unavailing" as "[n]owhere does the [PRA] specifically prohibit the use of any particular means of communication." *Id.* at 3.

CREW appeals both decisions. "We review the threshold requirements for mandamus jurisdiction de novo." *American Hospital Ass'n v. Burwell*, 812 F.3d 183, 190 (D.C. Cir. 2016);

*see also King v. Jackson*, 487 F.3d 970, 972 (D.C. Cir. 2007) (reviewing de novo a grant of a motion to dismiss).

## II.

"[T]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34 (1980). In order to obtain mandamus relief, a plaintiff must demonstrate (1) a "clear and indisputable right to relief," (2) that the government official has a "clear duty to act," and (3) that "no adequate alternative remedy exists." *American Hospital*, 812 F.3d at 189. "These three threshold requirements are jurisdictional; unless all are met, a court must dismiss the case for lack of jurisdiction." *Id.*; *see also Montrois v. United States*, 916 F.3d 1056, 1060 (D.C. Cir. 2019) (observing that the court "must assure [itself] of the existence of jurisdiction").

In order to satisfy the first requirement at this stage of the litigation, i.e. motion to dismiss, CREW must plausibly allege that the White House is, in effect, defying the law. *See In re Aiken County*, 725 F.3d 255, 266 (D.C. Cir. 2013) (granting mandamus relief because "the Commission [wa]s simply defying a law enacted by Congress, and the Commission [wa]s doing so without any legal basis"); *see generally Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (At the motion-to-dismiss stage, a court must "determine whether [the facts alleged] plausibly give rise to an entitlement to relief."). CREW has failed to do so for two interrelated reasons. First, by issuing the February 2017 Memo, the White House has instructed its staff to comply with the PRA, and it has done so by prohibiting the use of message-deleting apps and restricting electronic communications to official email accounts that automatically preserve records. To be sure, the Memo may not *guarantee* full compliance with the PRA, but—and this is the second reason— under the law of this circuit we would have no jurisdiction to

order the correction of any defects in the White House's day-to-day compliance with the Memo's records-preservation policy.

We begin with the February 2017 Memo, which White House Counsel prepared and distributed for the very purpose of "remind[ing] all personnel of their obligation to preserve and maintain presidential records, as required by the Presidential Records Act." February 2017 Memo, at 1. The Memo summarizes the statute, "outlines what materials constitute 'presidential records,'" distinguishes between "presidential" and "[p]urely personal" records, *id.* at 2, and describes "what steps [personnel] must take to ensure [presidential records'] preservation," *id.* at 1. The Memo prohibits the use of unofficial "internet-based means of electronic communications" and "instant messaging systems," and it requires personnel to "preserve electronic communications that are presidential records" and to use official email accounts for "all work-related communications." *Id.* at 2–3. And finally, the Memo forbids White House personnel from "dispos[ing] of presidential records," warning that "[a]ny employee who intentionally fails to take these actions may be subject to administrative or even criminal penalties." *Id.* at 3. In short, the Memo does just what the PRA requires.

CREW insists that we may not consider the February 2017 Memo at this motion-to-dismiss stage of the litigation. *See Hurd v. District of Columbia*, 864 F.3d 671, 675 (D.C. Cir. 2017) (finding that "the district court erred in dismissing [a] claim based on material beyond the complaint, and not incorporated by reference in it"). We disagree: the Memo is clearly subject to judicial notice. *See Kaspersky Lab, Inc. v. United States Department of Homeland Security*, 909 F.3d 446, 464 (D.C. Cir. 2018) ("Among the information a court may consider on a motion to dismiss are public records subject to

judicial notice." (internal quotation marks omitted)). Indeed, the Memo represents the White House's official position, it is publicly available on the National Archives' website, and CREW nowhere challenges its authenticity.

CREW argues that even if the February 2017 Memo may be considered, it fails to satisfy the three PRA obligations at issue in this case. We address each in turn, assuming for the sake of discussion that CREW has preserved its claims and that each of the three PRA obligations at issue creates a non-discretionary "duty to act." *American Hospital*, 812 F.3d at 189.

CREW's first argument focuses on the statutory duty to "categorize[]" records. 44 U.S.C. § 2203(b). "Because message-deleting apps automatically and instantaneously delete messages after a recipient reads them," CREW argues, "they preclude any categorization of records." Appellants' Br. 36. But the February 2017 Memo responds to this concern by directing staff to use official email accounts that "automatically archive[]" communications rather than unofficial "internet-based means of electronic communications," a category that clearly encompasses message-deleting apps. February 2017 Memo, at 2–3. Indeed, the simultaneously-issued Compliance Reminder Email—of which we also take judicial notice—expressly prohibits message-deleting apps "such as Snapchat [and] Confide," Compliance Reminder Email, at 2, and the February 2017 Memo directs that if White House personnel ever generate or receive presidential records on such platforms they "must preserve [the messages] by sending them to [an official] email account via a screenshot or other means," February 2017 Memo, at 3; *see also* Oral Argument 41:20–41:44 (CREW's counsel conceding that it is possible to take pictures of messages received on message-deleting apps before the

messages disappear). And having required the preservation of all communications, the Memo directs staff to comply with the PRA's categorization requirement: "electronic communications that are presidential records" "must [be] preserve[d]," but "[p]urely personal records . . . do not need to be preserved." February 2017 Memo, at 2.

CREW's second argument—that the use of message-deleting apps violates the President's duty to follow certain notification procedures before disposing of records, *see* 44 U.S.C. § 2203(c)–(e) (pre-disposal notification requirements)—fails for the same reason: the February 2017 Memo and the Compliance Reminder Email prohibit the use of message-deleting apps. To be sure, the Memo says nothing about the PRA's notification requirement, but it expressly forbids White House personnel from "dispos[ing] of presidential records," February 2017 Memo, at 3, and CREW has pointed to nothing suggesting that, after the initial preservation of emails via automatic archiving, the White House will violate the PRA's pre-disposal notification procedures.

Third, CREW claims that the President has failed to "implement . . . records management controls." 44 U.S.C. § 2203(a). But by distributing the February 2017 Memo, which instructs personnel on which devices to "conduct" their work and which records to "preserve," February 2017 Memo, at 2, the White House has implemented a form of records management controls for presidential records.

Citing recent articles alleging that White House personnel have continued using message-deleting apps even after issuance of the February 2017 Memo, CREW alleges that the Memo has proved ineffective in bringing the White House into compliance with the PRA. It may well be, as CREW puts it,

that questions about "what is actually happening in the White House," Appellants' Reply Br. 11, remain unanswered. But these types of "open questions" regarding the precise scope and effect of the facially PRA-compliant February 2017 Memo "are the antithesis of the 'clear and indisputable' right needed for mandamus relief." *In re Al-Nashiri*, 835 F.3d 110, 137 (D.C. Cir. 2016) (quotation marks omitted); *see In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000) (observing that mandamus relief is "reserved only for the most transparent violations" of duties to act).

The February 2017 Memo unquestionably speaks to the White House's efforts to satisfy the President's PRA obligations, and in its brief here the White House confirms what the Compliance Reminder Email makes explicit: that the Memo "covers the kinds of messaging applications at issue." Appellees' Br. 17; *see also In re Khadr*, 823 F.3d 92, 98 (D.C. Cir. 2016) (denying mandamus based on the government's representations that it was complying with statutory prohibition against "attempt[ing] to coerce" a military judge (internal quotation marks omitted)). Given this, not to mention other steps the White House has taken, such as mandatory PRA training, *see* Short Letter, at 2 ("All White House personnel have received or will receive mandatory in-person training on their obligations under the PRA."), we have no basis for saying that the President "is simply defying a law enacted by Congress," *In re Aiken County*, 725 F.3d at 266.

This brings us to the second and related obstacle to mandamus relief: even if, as CREW alleges, the February 2017 Memo is imperfectly enforced, we would lack jurisdiction to order the White House to take corrective action. That proposition flows not just from the nature of mandamus—the violation must be "clear and indisputable," *American Hospital*, 812 F.3d at 189—but also directly from this court's two key

PRA precedents, *Armstrong v. Bush* (*Armstrong I*), 924 F.2d 282 (D.C. Cir. 1991), and *Armstrong v. Executive Office of the President* (*Armstrong II*), 1 F.3d 1274 (D.C. Cir. 1993) (per curiam).

In *Armstrong I*, the plaintiffs, fearing that then-President George H.W. Bush was mishandling presidential and federal records from the tail end of the Reagan Administration, alleged that Bush's "inten[tion] to delete material from the White House computer systems" ran afoul of the PRA and other statutes. 924 F.2d at 286. We dismissed those claims, holding that given "the intricate statutory scheme Congress carefully drafted to keep in equipoise important competing political and constitutional concerns," *id.* at 290, "the PRA precludes judicial review of the President's recordkeeping practices and decisions," *id.* at 291.

Two years later, the case returned to our court, this time focusing (in part) on guidelines issued by the White House to distinguish between presidential and federal records. The plaintiffs alleged that the guidelines violated FOIA and the Federal Records Act because they classified federal records, generally subject to immediate public release, *see* 5 U.S.C. § 552 (FOIA record publication provisions), as presidential records, which, pursuant to the PRA, do not become eligible for release until five years after the President leaves office (or later if the documents contain certain sensitive material), *see* *Armstrong II*, 1 F.3d at 1290–91 (comparing the two regimes). We rejected the government's argument that *Armstrong I* barred this claim, explaining that the case "does not stand for the unequivocal proposition that all decisions made pursuant to the PRA are immune from judicial review." *Id.* at 1293. Quite to the contrary, when determining whether the Executive's definition of "presidential records" subverts FOIA by labeling as "presidential" those federal records that are otherwise

subject to immediate public release, we have authority to "review guidelines outlining what is, and what is not, a 'presidential record.'" *Id.* at 1294.

CREW and the White House have very different views about the implications of *Armstrong I* and *II* for this case. CREW interprets *Armstrong II* as authorizing courts to review "the Executive's ability to exempt an entire class of records (those created on message-deleting applications) from the PRA's reach." Appellants' Reply Br. 23. By contrast, the White House argues that the *Armstrong* decisions prohibit courts from reviewing any "claims that the President failed to comply with requirements of the [PRA]." Appellees' Br. 8. But we need not resolve that debate because even CREW agrees that when it comes to compliance with the PRA, courts have no jurisdiction to review the President's "day-to-day operations." Appellants' Reply Br. 23. As *Armstrong I* makes clear—and *Armstrong II* nowhere casts in doubt—when enacting the PRA, "Congress . . . sought assiduously to minimize outside interference with the day-to-day operations of the President." *Armstrong I*, 924 F.2d at 290. That, however, is precisely what CREW now asks us to do. Determining whether White House personnel are in fact complying with the directive to conduct all work-related communication on official email would require just the kind of micromanaging proscribed by *Armstrong I*.

Together, then, the February 2017 Memo and *Armstrong I* establish that CREW has no "clear and indisputable right to [mandamus] relief," *American Hospital*, 812 F.3d at 189, thus depriving this court of jurisdiction, *see Walpin v. Corp. for National & Community Services*, 630 F.3d 184, 187 (D.C. Cir. 2011) (denying mandamus because the President had "satisfie[d] the minimal statutory mandate"); *cf. In re Aiken County*, 725 F.3d at 266 (granting mandamus because, despite

several warnings, an agency had steadfastly refused to heed a clear statutory mandate). Given that CREW has failed at the threshold requirement of mandamus, we have no need to address the remaining two. *See In re Trade & Commerce Bank*, 890 F.3d 301, 303 (D.C. Cir. 2018) (per curiam) (explaining that where the plaintiff has no clear and indisputable right to relief, the court may "begin and end with the first" of the three mandamus requirements).

This resolution also disposes of CREW's claims for declaratory relief. For the same reasons that we decline to "resort to mandamus" to micromanage the President's day-to-day compliance with the PRA, we shall "not entertain [a claim] for declaratory relief." *Cartier v. Secretary of State*, 506 F.2d 191, 200 (D.C. Cir. 1974).

## III.

For the foregoing reasons, we affirm.

*So ordered.*