**REVISED**

**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 96-60326**
_____

**INTERAMERICAS INVESTMENTS, LTD.**
**and PETER ULRICH,**

Petitioners,

**versus**

**BOARD OF GOVERNORS OF THE**
**FEDERAL RESERVE SYSTEM,**

Respondent.

_____

**On Petition For Review**
**From The Board of Governors Of The**
**Federal Reserve System**
_____

April 16, 1997

Before HIGGINBOTHAM, DAVIS, and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

The starting point for this challenge to petitioners being found in violation of the Bank Holding Company Act, 12 U.S.C. § 1841 _et seq._, is whether the bases for that decision, such as prohibited control of a United States bank, constitute continuing violations within the five year limitations period of the applicable statute of limitations, 28 U.S.C. § 2462. The Board of Governors of the Federal Reserve System (the Board) imposed a cease and desist order and civil penalties of $1 million and $10,000

against Interamericas Investments, Ltd., and Peter Ulrich, respectively. We **DENY** the petition.

I.

The Board concurred in the extremely detailed and extensive findings of the Administrative Law Judge that, through a series of surreptitious transactions, Interamericas Investments, Ltd. (IAI), a Cayman Islands corporation largely owned by Mexican nationals, acquired and retained control of the National Bank of Conroe (NBC), of Conroe, Texas. Such conduct clashed with the Bank Holding Company Act (BHCA), which requires, *inter alia*, prior approval by the Board for "any action to be taken that causes any company to become a bank holding company". 12 U.S.C. § 1842(a)(1).

A company becomes a bank holding company when it acquires "control" of a bank, defined as: owning, controlling, or having the "power to vote 25 per centum or more of any class of voting securities of the bank"; or "control[ling] in any manner the election of a majority of the directors or trustees of the bank"; or exercising a direct or indirect "controlling influence over the management or policies of the bank". 12 U.S.C. § 1841(a)(2). In addition, a bank holding company is prohibited, with certain exceptions, from acquiring or retaining "direct or indirect ownership or control of any voting shares of any company which is not a bank". 12 U.S.C. § 1843(a). For violation of the Act, civil money penalties and cease and desist orders may issue. 12 U.S.C. §§ 1847(b)(1), 1818(b)(3).

- 2 -

Peter Ulrich, a Mexican national, moved to Conroe in 1982, and, on behalf of others still residing in Mexico, began dealing with United States banks.  Disappointed with the service he was receiving from them, Ulrich met with his longtime acquaintance Helmut Eindorf and with Mack Barnhill; the latter introduced Ulrich and Eindorf to Robert Rice, a lawyer in Conroe.  Rice, according to Barnhill, was experienced in organizing offshore corporations. The four men decided prior to early 1985 to acquire an existing bank, or create a new one, in the United States, to serve themselves and others in Mexico.  Rice informed Ulrich that such an undertaking would be difficult because the Board would not approve foreign investor control of a United States bank.

Ulrich, Rice, and Eindorf then set about finding Mexican national investors for the bank, promising anonymity of investment. The investment goal was speedy acquisition of a United States bank, as well as the use of that bank to launch other business ventures in the United States.

For purposes of acquiring such control, IAI was formed in March 1985 as a Cayman Islands corporation, with two classes of stock.  The Class A shares held all voting rights, and were eventually issued to Enrique Pimienta, a Mexican accountant responsible for recruiting many of the Mexican investors.

Also in early 1985, the group began to pursue the purchase of NBC, which had $10 to $11 million in deposits.  During these negotiations, Ulrich made clear again that he was not interested in merely investing in NBC.

Rice, with Ulrich's assistance, completed the agreement for acquisition of NBC, with Rice acting on behalf of IAI, the entity truly acquiring NBC. In order to fund the acquisition, but retain the anonymity of the Mexican investors, Conroe residents (United States nationals) were recruited to hold the NBC shares on behalf of IAI. The funding for these nominee resident investors was to come from a Houston bank, Langham Creek.

Langham Creek, however, did not have the financial resources for the acquisition. As a result, Ulrich and Pimienta raised all of the necessary funds, then placed them, in the form of certificates of deposit (CD's), with Langham Creek. These CD's served to collateralize fully Langham Creek loans to the Conroe investors. Rice offered Langham Creek not only this full collateralization, but also the promise that the loans would be repaid within the first year of their issuance, before any principal or interest payments came due.

Rice then told the Conroe investors that their notes would be purchased from them by Mexican investors within the first year, but did not tell them that the notes were collateralized by the latters' CD's. As a result of this structuring, none of the Conroe investors paid for their NBC shares, with the exception of Rice and four others.

Through the Conroe investors, approximately $43 million was funneled for the purchase of NBC. Rice, however, acquired the right to vote the shares of each of the Conroe investors through a

ten year irrevocable voting trust agreement which allowed him to control NBC.

In May 1985, Rice submitted a Loan Commitment Letter and a Notice of Change in Bank Control to the Office of the Comptroller of the Currency (OCC). The notice listed the acquiring parties as Rice, Barnhill, and the other Conroe investors; did not list the Mexican nationals; and did not disclose that IAI and the foreign investors provided the CD's for the Langham Creek notes, or that IAI would be the majority owner of NBC. For NBC's board, the notice proposed two holdover directors, two holdover managers, and Rice and four Conroe investors, giving Rice and the four investors majority control of NBC.

The OCC in June 1985 advised that it was not disapproving the change in control of NBC. The acquisition closed in July, at which point Rice and the Conroe investors became owners of approximately 80 percent of the shares in NBC. Rice elected a new board of directors, making himself chairman.

After the closing, Ulrich, Eindorf and Pimienta began depositing the Mexican funds in NBC. Most of the accounts opened by Ulrich named IAI as the depositor, in order to preserve the anonymity of the actual investors, and now depositors, in NBC. In addition, NBC began making "back to back" loans for Mexican nationals (loans secured by a CD at NBC), although those loans were often hidden through IAI, or an unrelated party, again in order to maintain the anonymity of the Mexican nationals.

Rice also formed a one bank holding company, Sun Belt Bancshares, which would own the NBC shares purchased by the Conroe investors. Twice in 1985, Rice submitted applications to the Federal Reserve Board at Dallas, Texas (FRB-Dallas), seeking approval of Sun Belt as a bank holding company (BHC), under the BHCA, 12 U.S.C. § 1842(a)(1). Both were returned: the first, for being substantially incomplete; the second, which did not mention any relation between Sun Belt and IAI, NBC, or even Rice, for failing to meet the FRB-Dallas' equity structure requirements.

That November, Rice again applied to the FRB-Dallas, using an exchange of two NBC shares for one of Sun Belt. Among other things, the application stated that it represented the exchange that would occur between Rice and the Conroe investors, and that there would be a new voting trust agreement through which Rice would vote the Conroe investors' Sun Belt shares. The application did not mention IAI, Ulrich, or Pimienta as principals of Sun Belt, even though the application was required to list all principals. It also did not disclose that IAI's CD acted as full collateral for Rice's Langham Creek loan, and that that loan was non-recourse, even though the application required the applicant to disclose all indebtedness and collateral retained in connection with the acquisition of the shares of the bank. Finally, the application did not disclose that Sun Belt would issue 95 percent of the equity to IAI in non-voting shares, even though the application required full disclosure of any plans to raise capital, long term debt, or capital notes.

The BHC was approved in December 1985. The approval letter stated that the Federal Reserve System was relying on the representations and commitments of the applicant, and that Rice should notify the FRB-Dallas of any significant adverse deviations from the application, in that they could bring about action under the BHCA.

After BHC status was approved, Ulrich and Eindorf, acting as "trustee and ministerial agents" for IAI, agreed with Langham Creek to purchase from it the loans and accompanying collateral of Rice and the other Conroe investors. Ulrich and another IAI official also gave gifts of about three percent of the non-voting shares of Sun Belt to those Conroe investors.

Later that December, Rice amended Sun Belt's articles of incorporation, creating two classes of shares. The class A shares had all voting rights (despite the fact that the BHC application made no mention of non-voting stock). After Sun Belt took over the control of NBC, the Conroe investors executed a new voting trust agreement which gave Rice all power to vote Sun Belt shares, similar to the earlier agreement for the NBC shares.

In the Spring of 1986, IAI purchased 108,991 shares of Sun Belt class B stock, for approximately $545,000 in cash, plus the delivery of the Langham Creek notes for the Conroe resident investors other than Rice. Rice issued two voting trust certificates to IAI for those shares.

The original acquisition agreement between Rice and the original NBC shareholders stated that such NBC shareholders who did

not want to sell their shares immediately would be offered $15 per share.  In February 1986, IAI purchased 34,150 NBC voting shares at that price.  These NBC shares were then exchanged for 102,450 Sun Belt non-voting class B shares which were issued to IAI.

And, in February 1986, IAI authorized the investment of $300,000 to purchase 60,000 Sun Belt class B shares.  Part of these funds helped offset costs of the NBC growth incurred due to the increased use of NBC by IAI.

Sun Belt extinguished the Langham Creek debt of each of the Conroe investors, except two: Rice; and one investor on whom Sun Belt had foreclosed.  Rice's note was purchased later by IAI, and Rice was named primary counsel for IAI.

With these structures in place, the parties turned to actual control of NBC.  Rice appointed Eindorf, then Ulrich, Pimienta, and finally Barnhill as successor trustees of IAI.  Also, Ulrich became Rice's successor for the NBC voting trust agreement.  (Earlier, Rice had warned Ulrich that, should Ulrich not do what Rice wanted him to do, Ulrich might be imprisoned.)  In June 1986, Rice named a new successor trustee under the Sun Belt voting trust agreement, with Ulrich named secondary successor.

When actual operation of NBC by IAI began, tension increased between Rice on the one hand and Ulrich and Hugo Pimienta, Enrique Pimienta's son, who was working with Ulrich as an accountant, on the other.  In 1988, Rice agreed to sell his Sun Belt voting shares and end his relationship with IAI, Sun Belt, and NBC.

Ulrich then submitted a Notice of Change in Bank Control to the FRB-Dallas, proposing that he take over Rice's shares of Sun Belt. This was not approved because it would give IAI a significant ownership interest in Sun Belt. Furthermore, the FRB-Dallas determined that it appeared that IAI was already a BHC, in violation of the BHCA. The FRB-Dallas required IAI to either submit for approval as a BHC, or divest of Sun Belt.

At this point, the FRB-Dallas investigated IAI and discovered that it had funded and secured the Langham Creek notes. Ulrich then re-applied for a Change in Bank Control, and proposed that IAI divest ownership of Sun Belt by transferring its Sun Belt shares to IAI's other three shareholders. At a subsequent meeting with the FRB-Dallas, Ulrich stated that he learned from Rice that, if the identity of the Mexican investors were known, the IAI takeover of NBC would not be approved, and that he did not know how Rice accomplished the IAI takeover of NBC. This second notice was also rejected.

Next, Ulrich proposed that he acquire Sun Belt's voting stock, and the IAI shareholders acquire almost all of Sun Belt's non-voting shares; that, after the change in control, all Sun Belt shares would be converted into voting shares; and that IAI would divest of Sun Belt, creating Holdcon, a corporation which would be majority owned by the minority owners of IAI, and IAI's majority owners would own only a minority interest in Holdcon. Ulrich would be the only person common to management of Sun Belt, NBC and Holdcon. The FRB-Dallas agreed that Ulrich should separate himself

- 9 -

from Holdcon entirely, although Ulrich again misled the FRB-Dallas by not disclosing, *inter alia*, that he would retain ownership of IAI through other means in Mexico.

In late 1989, the FRB-Dallas discovered Ulrich's interest in a Mexican currency exchange firm and that that firm had significant relations with NBC, and that Holdcon was actually wholly owned by Yan & Yan Overseas Trading, B.V. In response to inquiries from the FRB-Dallas, Ulrich stated that IAI owned Zandradale, N.V. (Netherlands Antilles), which owned Yan & Yan, which owned Holdcon, and that Holdcon owned a non-banking subsidiary, Ameristates Title Co. Needless to say, the Notice of Change in Bank Control was not approved. Moreover, IAI Inc., owned by IAI, also had at least 50 percent ownership of a number of non-banking ventures in the United States.

In August 1994, seeking a cease and desist order under 12 U.S.C. § 1818(b), and civil money penalties under 12 U.S.C. § 1847(b), against IAI and Ulrich, the FRB-Dallas charged that IAI became a BHC without prior approval and had engaged in non-banking activities, some of which are not allowable, and others of which, at a minimum, required prior Board approval. (The Notice also charged Rice. He entered into a consent order of prohibition and a consent order for assessment of civil money penalties with the OCC.) IAI and Ulrich divested themselves of NBC at a profit to IAI of $6.6 million, and to Ulrich of $42,000.

The ALJ recommended the penalties, but recommended against the cease and desist order. Both sides filed exceptions. The Board

adopted the ALJ's recommendation, except that it imposed the requested general cease and desist order.

## II.

There are four issues at hand. First, was this BHCA proceeding timely under the applicable statute of limitations, 28 U.S.C. § 2462? Second, was there sufficient "control" of NBC and Sun Belt to trigger the requirements of the BHCA? Third, is scienter required to sustain liability under the Act? And fourth, were the penalties and cease and desist order allowable?

## A.

The Board's August 1994 Notice of Charges, which stated that it had reasonable cause to believe that IAI, Ulrich, and Rice had violated both the BHCA, 12 U.S.C. § 1841 *et seq.,* and the Board's Regulation Y, 12 C.F.R. § 225.11(a), came more than five years after the IAI takeover of Sun Belt and NBC. The BHCA does not provide a limitations period for the actions brought by the Board. At issue is whether the Notice was timely under a general federal statute of limitations, which provides in pertinent part:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued....

28 U.S.C. § 2462.

Because the initial violations -- such as in July 1985, when Rice and the Conroe investors acquired NBC, and in January 1986, when Sun Belt became a BHC -- occurred more than five years prior

to commencement of the Board's action, we must determine if IAI's and Ulrich's actions qualify as "continuing violations". In short, under a continuing violation theory, a new claim accrues each day the violation is extant. *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 502 n.15 (1967).

Petitioners do not dispute that § 2462 applies. Therefore, we must determine whether it and the BHCA allow a continuing violation; and, if they do, whether petitioners' actions constituted one.

1.

A continuing violation applies where the conduct is ongoing, rather than a single event. *See Toussie v. United States*, 397 U.S. 112, 136 (1970)(continuing violations "set on foot by a single impulse and operated by an unintermittent force"). Along that line, statutes of limitations in the civil context are to be strictly construed in favor of the Government against repose. *Badaracco v. Commissioner of Internal Revenue*, 464 U.S. 386 (1984); *E.I. DuPont Nemours & Co. v. Davis*, 264 U.S. 456, 462 (1924).

The court should defer to the agency interpretation whether a continuing violation theory is available under a certain statute if the statute of limitations is entrusted to the agency's interpretation, *Capital Telephone v. Federal Communications Commission*, 777 F.2d 868 (2d Cir. 1985). On the other hand, the interpretation of the general statute, § 2462, may not be influenced by the governmental agency bringing the action. *3M v. Browner*, 17 F.3d 1453, 1461 (D.C. Cir. 1994). With this in mind,

we turn to the BHCA, the substantive statute underlying the Board's claim, to determine whether it contemplates a continuing violation theory.

For reporting statutes such as the BHCA, so long as the reporting need not occur within a certain time span, a failure to report certain conditions will generally constitute a continuing violation for so long as the failure to report persists. *Hanover Shoe, Inc.*, 392 U.S. at 502 n.15. In addition, the BHCA requires, *inter alia*, that any company becoming a BHC register with the Board within 180 days of doing so, and that, except under limited circumstances, a BHC not acquire companies performing non-banking functions. 12 U.S.C., 1843(a), 1844(a).

And, even more to the point, the BHCA states also that

> [a]ny company which violates, and any individual who participates in a violation of, any provision of this chapter, or any regulation or order issued pursuant thereto, shall forfeit and pay a civil penalty of not more than $25,000 for each day *during which such violation continues*.

12 U.S.C. § 1847(b)(1)(emphasis added). Where the civil penalty provision at hand contemplates per diem penalties for violations, then continuing violations are cognizable under the general statute of limitations. *United States v. Marine Shale Processors*, 81 F.3d 1329, 1357 (5th Cir. 1996).

Here, the BHCA has more than per diem penalties; as emphasized above, it refers to "continuing violations". Furthermore, the BHCA uses the present tense in describing the offenses, making

reasonable reading it as contemplating continuing violations. ***Abercrombie v. OCC***, 833 F.2d 672, 676 (7th Cir. 1987).

And, unlike § 2462, the interpretation of the BHCA is entrusted to the Board; therefore, that interpretation is due the deference demanded by ***Chevron USA v. Natural Resources Defense Council, Inc.,*** 467 U.S. 837 (1984). To hold other than that a continuing violation is allowed in this instance would be contrary not only to our precedent, but also to the plain language of the BHCA and the Board's interpretation of it.

2.

As for whether a continuing violation of the BHCA occurred, the Act prohibits the unapproved acquisition *and retention* of a United States bank. As discussed, such acquisition is based on the notion of "control", defined as, *inter alia*, owning, controlling, *or having the power* to vote 25 percent of the voting shares of a bank. 12 U.S.C. § 1841(a)(1), (a)(2)(A). So long as the approval has not been received, such control is in violation of the Act. As discussed *infra*, the Board found sufficient control of NBC by both IAI and Ulrich to trigger the reporting requirements of the BHCA, and neither relinquished control until after the proceeding commenced. Among other violations, this continued control constituted a continuing violation actionable under the BHCA for a period of five years after, among other proscribed actions, IAI and Ulrich last had the power to vote 25 percent of NBC's shares. The Notice of Charges, well within that period, was timely. Along that line, the penalties imposed were well under the maximum for the

total number of days that fell within five years of the date of the Notice.

In sum, the BHCA -- and, indeed, common sense -- preclude control of a bank, in violation of the BHCA, simply because such continuing control began more than five years before the Board initiated action.

B.

Petitioners assert that the requisite control was not shown. We disagree.

As noted, control exists under the BHCA when, *inter alia*, a "company directly or indirectly or acting through one or more other persons owns, controls, or has the power to vote 25 per centrum or more of any class of voting securities of the bank or company." 12 U.S.C. § 1841(a)(2)(A). In short, the BHCA may be triggered by, *inter alia*, the mere potential for manipulation of a bank.

IAI and Ulrich contend that the Board's findings fail to meet a different standard for "control" promulgated with the 1970 revision to the BHCA. That standard triggers the reporting requirements when a "company directly or indirectly exercises a controlling influence over the management or policies of the bank or company". 12 U.S.C. § 1841(a)(2)(C). Because of other discussed violations, we need not look to whether that standard was violated.

As for whether IAI and Ulrich had the power to vote the requisite number of shares during the five year period prior to the Notice of Charges, petitioners contend there could be no control over those shares, because in 1988 Rice and Ulrich entered into an

agreement placing Rice's Sun Belt shares in escrow, for delivery to Ulrich upon approval of the transaction by the Board.  Until Board approval, the agreement stated that neither party had the power to vote those shares.

But, IAI and Ulrich maintained control over NBC despite the escrow agreement.  Substantial evidence supports the Board's finding that, at the time he signed the shares over to Ulrich, Rice could act only with Ulrich's approval.  Furthermore, the agreement granted Ulrich the power, unilaterally, to invoke specific performance by Rice and to waive the regulatory approval requirement.

Furthermore, as the Board found, any power not expressly vested in Ulrich could be exercised by Ulrich and Rice acting in concert.  The contention that the tension between them precluded the possibility that they would cooperate to control NBC pays little heed to the statutory language concerning the "power to vote" the NBC shares, a power which Ulrich and IAI maintained throughout the period in question.

The contention also runs contrary to the Board's decision in 1976 at 12 C.F.R. § 225.134 ("Escrow arrangements involving bank stock resulting in a violation of the Bank Holding Company Act") that acquiring and placing in escrow, with an unaffiliated escrow agent, bank shares sufficient for control did vest control in the recipient company where the escrow agreement also stated that the recipient company was not to have power to vote the shares until they were released from escrow, after the Board's approval of the

transaction. The decision rested on the fact that, although the shares remained in escrow, title to them had passed to the recipient, and the escrow agreement did not require the return of the shares to the original seller in the case of board refusal, but rather to the recipient company's shareholders. *Id*.

This proceeding represents only negligible deviation from the scenario for the foregoing decision by the Board in 1976. Here, the escrow agent was not unaffiliated, but rather acted as the agent of IAI. If anything, this distinction bolsters the Board's finding that IAI and Ulrich maintained control over the shares, despite their placement in escrow.

Also, as found by the Board, there is substantial evidence that IAI and Ulrich both exercised *indirect control* over NBC. For the takeover of NBC by Rice, and ultimately by IAI, Rice was acting as IAI's agent. The Board found that the Conroe investors were nominal; that they were used by Rice and Ulrich to screen the true identity of the purchaser of NBC.

C.

*First National Bank of Gordon v. OCC*, 911 F.2d 57, 63-64 (8th Cir. 1990), held that 12 U.S.C. § 161(a), requiring, *inter alia*, that banks make true condition reports, allowed a cease and desist order for banks which erroneously, but reasonably, believe their reports are correct, absent the statute explicitly imposing such a standard; but, in *dicta*, it questioned whether civil penalties could be imposed. Petitioners rely on this to maintain that civil penalty provisions which do not state a scienter requirement, such

as in the BHCA, 12 U.S.C. § 1847(b)(1), require scienter. Concomitantly, they maintain that we must bear in mind a claimed atmosphere of trust pervading the Mexican economy, so that Ulrich must have implicitly trusted Rice's word that the transactions were legal.

Obviously, the foregoing Eighth Circuit decision is distinguishable. And, the contention that nationality can act as the predicate for differing standards for BHCA liability is beyond frivolous. In sum, this contention is meritless.

The BHCA defines a "violation" of its provisions as "any action ... for or toward causing, bringing about, participating in, counseling, or aiding or abetting a violation". 12 U.S.C. § 1847(b)(5). There is no mention of scienter: the *action* alone constitutes the violation. Indeed, the very mental state which petitioners contend bars a civil penalty, "good faith", is listed instead in the Act as a mitigating factor for the penalty. 12 U.S.C. § 1818(i)(2)(G). Needless to say, a statute should be read to give effect to all of its language. *See **Fitzpatrick v. FDIC***, 765 F.2d 569, 578 (6th Cir. 1985)("good faith goes only to the amount of the penalty" in construction of 12 U.S.C. § 1818(i)(2)(I)(identical to current § 1818(i)(2)(G))).

D.

Finally, petitioners challenge the civil penalties and general cease and desist order.

1.

An agency's penalty determination is reviewed with significant deference. *See* **Butz v. Glover Livestock Comm'n**, 411 U.S. 182, 185 (1973). Accordingly, petitioners concede that the Board's decision not to mitigate the penalties imposed under 12 U.S.C. § 1847(b)(1) is reviewed only under the "arbitrary and capricious" standard. They maintain, however, that there are clearly defined factors which the Board must consider in making that decision: harm, *vel non*, to the institution or public confidence; willfulness; frequency or recurrence of the alleged violations; cooperation by respondents; concealment or voluntary disclosure; restitution to the institution; previous criticism; compliance by respondents; unsafe or unsound practices; and preventive measures.

Although many of these factors may seem proper for the Board to consider in determining the penalty, they are by no means mandatory. An assessment under 12 U.S.C. § 1847 (b)(1) is "subject to" subparagraphs (E),(F),(G), and (I) of 12 U.S.C. § 1818(i)(2)(Federal Deposit Insurance Corporation Act violations). Subsection (G) of § 1818(i)(2) requires only that, for possible mitigation of penalties, the Board consider:

> (1) the size of the financial resources and good faith of the insured depository institution or other person charged;
> (2) the gravity of the violation;
> (3) the history of previous violations; and
> (4) such other matters as justice may require.

12 U.S.C. § 1818(i)(2)(G). These factors were considered, as hereinafter discussed.

The financial resources of IAI and Ulrich do not militate for mitigation. They stipulated that they had the resources to satisfy the penalties sought by the Board. Furthermore, in the sale of NBC and Sun Belt, IAI and Ulrich made profits of approximately $6.6 million and $42,000 respectively. The penalties imposed, $1 million and $10,000 respectively, were therefore well within their financial resources, even if the analysis were limited only to the resources available as a result of the financial transactions at issue.

The petitioners were found to have not acted in good faith; far from it. As discussed, they desired, and contrived to acquire, secret control of a United States bank; and the lengths to which they went in their effort to do so evinced bad faith.

The "gravity of the violation[s]" at issue was correctly considered not to mitigate the penalties. The BHCA was enacted to protect, *inter alia*, against precisely this sort of control of a United States bank, with little or no accountability among the true owners. Also, the owners used their anonymous ownership of the NBC to launch into other non-banking businesses in the United States, again with little or no accountability.

Finally, the history of previous violations was tacitly addressed by finding that IAI retained control of NBC for years after it knew that the Board considered that control to be violative of the BHCA. The Board found further that no other factors justified mitigation of the penalty.

The factors listed by petitioners as mandatory, but that are not specifically listed in § 1818(i)(2)(G), come from "Relevant considerations for assessment of civil penalty", 12 C.F.R. § 263.62, and *In re Rapp*, 1992 WL 560907. In short, these two sources are not binding on the Board.

Furthermore, the penalties imposed are more than reasonable under the circumstances. The Board did not seek the full amount of penalties for the entire period during which IAI and Ulrich were in violation of the BHCA; and, again, the penalties imposed were far less than the profits from the sale of the bank.

2.

Petitioners assert that the cease and desist order was improper for two reasons: that the Notice of Charges did not seek a general, prospective cease and desist order, only divestiture from Sun Belt and NBC; and that there was no evidence of a likelihood that they would continue to violate the BHCA, as required by the BHCA before such a general order may issue. Despite some unsupported references to a due process violation for inadequate notice, IAI and Ulrich assert specially only that the Notice violated the Board's regulations. We therefore address only those requirements.

The Notice must contain, *inter alia*, "[a] statement of the matters of fact or law showing that the Board is entitled to relief" and "[a] proposed order or prayer for an order granting the requested relief". 12 C.F.R. § 263.18(b)(2), (3). Although the Notice did not refer to a general cease and desist order, it did

reference a specific cease and desist order, and "other affirmative action" that may be required by petitioners' prior acts. It stated further that the affirmative action "may include divestiture of all of IAI's, Ulrich's and Rice's interests in Sun Belt and NBC".

This language satisfies the regulation because the words "other affirmative action" were not limited to specific acts relating to NBC. And, that the Notice said the cease and desist order *may include* some subjects cannot limit the order to those subjects, where the factual and legal predicate for wider scope is so clear from the charges in the Notice. Moreover, the Board may impose a general cease and desist order based on prior violations of the BHCA. The only logical conclusion from these facts is that the other affirmative action which IAI and Ulrich were notified they may be required to undertake included a prospective general cease and desist order.

Petitioners contend that the reference to "other affirmative action" references instead to 12 U.S.C. § 1818 (b)(6), which implies a more limited remedy for "other affirmative action". The section appears to equate "[a]ffirmative action" with action "to correct conditions resulting from violations", such as restitution. 12 U.S.C. § 1818(b)(6). A reference to § 1818(b)(6), however, is not explicit in the Notice, and therefore the remedies available to the Board are not so limited.

## III.

For the foregoing reasons, the petition for review is

**DENIED.**

- 22 -