# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-60191

United States Court of Appeals
Fifth Circuit

**FILED**

June 1, 2018

Lyle W. Cayce
Clerk

STATE OF TEXAS,

Petitioner

v.

UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF
ENERGY; JAMES RICHARD "RICK" PERRY, IN HIS OFFICIAL
CAPACITY AS UNITED STATES SECRETARY OF ENERGY; UNITED
STATES NUCLEAR REGULATORY COMMISSION; KRISTINE L.
SVINICKI, IN HER OFFICIAL CAPACITY AS CHAIRMAN OF THE
UNITED STATES NUCLEAR REGULATORY COMMISSION; UNITED
STATES NUCLEAR REGULATORY COMMISSION ATOMIC SAFETY AND
LICENSING BOARD; THOMAS MOORE, PAUL RYERSON, AND
RICHARD WARDWELL, IN THEIR OFFICIAL CAPACITIES AS UNITED
STATES NUCLEAR REGULATORY COMMISSION ATOMIC SAFETY AND
LICENSING BOARD JUDGES; UNITED STATES DEPARTMENT OF THE
TREASURY; AND STEVEN T. MNUCHIN, IN HIS OFFICIAL CAPACITY
AS UNITED STATES SECRETARY OF THE TREASURY,

Respondents

Petition for a Writ of Mandamus to the
Nuclear Regulatory Commission

Before HIGGINBOTHAM, HAYNES, and GRAVES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This is the latest of many disputes arising out of the government's
struggle with nuclear waste disposal under the Nuclear Waste Policy Act of

No. 17-60191

1982 (the "Waste Act"),[1] a congressional effort to "establish a schedule for the siting, construction, and operation of repositories."[2] The state of Texas petitions for declaratory and injunctive relief, and the state of Nevada moves to dismiss. We will grant the motion to dismiss.

## I.

Under the statutory framework of the Waste Act, new repositories were to provide centralized housing for spent nuclear fuel and high-level radioactive waste ("waste") produced by reactors scattered throughout the states. The Waste Act initially envisioned a system in which the Department of Energy would identify a handful of suitable repository sites from which it would recommend three to the president by January 1, 1985.[3] Although the Department of Energy eventually settled on the Yucca Mountain, Nevada, site and two others, Congress amended the Waste Act in 1987 to designate Yucca Mountain the sole candidate for a repository,[4] directing the Department of Energy to accept the waste from the states by January 31, 1998.[5] Yet by the mid-1990s, the Department of Energy made clear that it could not meet the 1998 deadline, and it came and went without the federal government accepting any waste.

As directed, the Department of Energy focused on the Yucca Mountain site, conducting a series of preliminary tasks and assessments before in 2002 formally recommending the building of a repository there.[6] Congress approved,

---

[1] 42 U.S.C. § 10101 *et seq.*

[2] *Id.* § 10131(b)(1).

[3] *Id.* § 10132(b)(1)(B) ("[T]he Secretary shall recommend to the President 3 of the nominated sites not later than January 1, 1985 for characterization as candidate sites.").

[4] *See* Nuclear Waste Policy Amendments Act of 1987, Pub. L. No. 100-203, 101 Stat. 1330.

[5] 42 U.S.C. § 10222(a)(5)(B) ("[I]n return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subchapter.").

[6] *See In re Aiken County*, 645 F.3d 428, 431 (D.C. Cir. 2011) ("*Aiken I*").

2

## No. 17-60191

with another deadline: the Department of Energy had ninety days to submit an application for construction authorization to the Nuclear Regulatory Commission.[7] The Department of Energy did not submit this required application until 2008.[8] And when it did so, its submission triggered yet another deadline, requiring the Nuclear Regulatory Commission to complete application review by 2012.[9]

This deadline, too, would go unmet, as just a couple of years later, the Department of Energy hesitated. In 2010, while the tribunal branch of the Nuclear Regulatory Commission, known as the Atomic Safety and Licensing Board (the "Licensing Board"), was reviewing the Yucca Mountain application, the Department of Energy attempted to withdraw the application, professing renewed doubt about the viability of the Yucca Mountain site. Both the Licensing Board and the Nuclear Regulatory Commission denied the request for withdrawal,[10] but then the Licensing Board decided to hold the licensing proceeding in abeyance due to a lack of funding.[11]

Lawsuits followed. Various state and local government entities challenged the Department of Energy's attempt to withdraw the Yucca

---

[7] *See id.* at 432.

[8] *See id.*

[9] 42 U.S.C. § 10134(d) ("The Commission shall consider an application for a construction authorization for all or part of a repository in accordance with the laws applicable to such applications, except that the Commission shall issue a final decision approving or disapproving the issuance of a construction authorization not later than the expiration of 3 years after the date of the submission of such application, except that the Commission may extend such deadline by not more than 12 months if, not less than 30 days before such deadline, the Commission complies with the reporting requirements established in subsection (e)(2) of this section.").

[10] *In re U.S. Department of Energy*, 71 N.R.C. 609 (2010); *In re U.S. Department of Energy*, 74 N.R.C. 212 (2011).

[11] *In re U.S. Department of Energy*, 74 N.R.C. 368 (2011) ("In light of current fiscal constraints . . . , the Board suspends the proceeding on the Department of Energy's application for authorization to construct a national high-level nuclear waste repository at Yucca Mountain, Nevada.").

No. 17-60191

Mountain application, and in 2011, the D.C. Circuit, in its *Aiken I* decision, dismissed their complaint for lack of ripeness and finality.[12] In 2013, in response to the Licensing Board's decision to pause the licensing proceeding, the D.C. Circuit issued its *Aiken II* decision and granted a writ of mandamus to roughly the same group of entities, instructing the Nuclear Regulatory Commission to "promptly continue with the legally mandated licensing process."[13] The order requires the Nuclear Regulatory Commission to continue to spend its funds in line with the statutory requirement of the Waste Act "unless and until Congress authoritatively says otherwise or there are no appropriated funds remaining."[14]

At the time of the *Aiken II* decision, the Nuclear Regulatory Commission had approximately $11 million in its coffers, a sum that it believed to be woefully inadequate to complete the entire licensing process.[15] So, in the wake of the decision, the Nuclear Regulatory Commission solicited the opinions of parties to the adjudicatory proceedings on how best to triage its remaining funds.[16] The path forward, the Nuclear Regulatory Commission decided, consisted mainly of completing a Safety Evaluation Report, a required step in the licensing process.[17] As it has sailed on that tack, the $11 million has withered into less than $700,000 in unobligated funds.

---

[12] *See Aiken I*, 645 F.3d at 435–37.

[13] *See In re Aiken County*, 725 F.3d 255, 267 (D.C. Cir. 2013) ("*Aiken II*").

[14] *Id.*

[15] *Id.* at 258. Indeed, Chief Judge Garland dissented from the *Aiken II* court's holding, explaining that in light of the limited funding, "granting the writ in this case will [] direct the Nuclear Regulatory Commission to do 'a useless thing.'" *Id.* at 269 (Garland, C.J., dissenting).

[16] *In re U.S. Department of Energy*, CLI-13-08, 2013 WL 7046350, at *1 (N.R.C. Nov. 18, 2013) ("We issued an order seeking comment from the participants in this adjudication as to how the agency should continue with the licensing process.").

[17] *Id.* at *3. The Nuclear Regulatory Commission also focused on uploading licensing support network documents onto a new recordkeeping system, and completing a supplemental environmental impact statement. *Id.* at *5–6.

No. 17-60191

Meanwhile, in 2010, while the Nuclear Regulatory Commission was undertaking the licensing process, then-President Obama established a Blue Ribbon Commission to explore an alternative system of "consent-based siting" for waste storage. The Commission concluded that consent-based siting, not the Yucca Mountain repository, represented the most promising path forward, publishing a strategy document to that effect in 2013 and inviting public comment on the subject in 2015. More recently, in 2017, the Department of Energy published a draft report "lauding the consent-based siting process," and initiated another related public comment period that expired in April 2017. Nothing came of its actions, and the Department of Energy now advises that the Trump Administration "does not intend to take further policy action on the consent-based siting activities in question."

While Texas was not involved, it had its wary eyes on these proceedings, and on March 14, 2017, petitioned this Court for relief, naming various federal entities as defendants, including the Department of Energy, Nuclear Regulatory Commission, Licensing Board, Department of Treasury, and various federal officials associated with these agencies (collectively, the "federal respondents"). Relying on 42 U.S.C. § 10139(a)(1), Texas argues that the federal respondents violated their obligations under the Waste Act in their pursuit of consent-based siting, failure to complete the Yucca Mountain licensing process by 2012, and failure to accept the waste by 1998.

Seeking several different remedies, Texas characterizes "[t]he thrust" of its petition as a request for "equitable relief prohibiting [the Department of Energy] from conducting any other consent-based siting activity and ordering Respondents to finish the Yucca licensure proceedings," supported by ancillary remedies, such as civil contempt and appointment of a special master. After Texas filed its petition, the Nuclear Energy Institute alongside various nuclear

5

## No. 17-60191

utilities companies (collectively, the "NEI") and the state of Nevada intervened, all of which oppose Texas's petition on jurisdictional and substantive grounds.

After filing its petition, Texas moved for declaratory and injunctive relief; Nevada responded with its own motion to dismiss, which the federal respondents and the NEI supported in substance.

## II.

As is plain, Texas flies here on creatively fashioned jurisdictional wings. In the ordinary course, civil actions—including petitions for mandamus, one of the remedies Texas seeks—must first be filed in federal district court, our court of first instance.[18]

Texas brings its petition under 42 U.S.C. § 10139(a)(1), which states in part:

> (a) Jurisdiction of United States courts of appeals
>> (1) Except for review in the Supreme Court of the United States, the United States courts of appeals shall have original and exclusive jurisdiction over any civil action—
>>> (A) for review of any final decision or action of the Secretary, the President, or the Commission under this part;
>>> (B) alleging the failure of the Secretary, the President, or the Commission to make any decision, or take any action, required under this part; . . . .[19]

Texas asserts that we have this "original and exclusive jurisdiction," a plausible argument if the statute ended there. It does not. It also includes a

---

[18] *See* 28 U.S.C. § 1361 ("The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."); *see also id.* § 2201 ("In a case of actual controversy *within its jurisdiction*, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." (emphasis added)).

[19] 42 U.S.C. § 10139(a)(1)(A)–(B).

timeliness requirement: "A civil action for judicial review described under subsection (a)(1) of this section may be brought not later than the 180th day after the date of the decision or action or failure to act involved . . . ."[20]

And of course, the actions and omissions that Texas challenges came and went years ago.[21] The only discrete actions that Texas points to that occurred within 180 days of its petition are the Department of Energy's decision to release a consent-based siting document and to solicit public comments on that document.

Sensitive to this hurdle, Texas points us to the continuing violations doctrine. However, before determining whether the continuing violations doctrine should apply to Texas's claims, we must first confront a preliminary question: whether the Waste Act's 180-day deadline imposes a limit on our subject matter jurisdiction. If it does, we must dismiss without reaching the applicability of the continuing violations doctrine.[22]

---

[20] *Id.* § 10139(c).

[21] Indeed, in 1998, the Waste Act's statutory deadline for acceptance of waste passed; in 2010, the Department of Energy attempted to withdraw its Yucca Mountain licensing application from the consideration of the Licensing Board; in 2010, President Obama established his Blue Ribbon Commission on consent-based siting; in 2011, the Nuclear Regulatory Commission suspended the Yucca Mountain licensing proceeding; in 2012, the Waste Act's statutory deadline for completion of the Yucca Mountain licensing proceeding passed; in 2013, the Nuclear Regulatory Commission sought the views of participants on how to proceed with the licensing proceeding and settled on creating a Safety Evaluation Report; in 2013, the Department of Energy released a strategy document relating to consent-based siting; and in 2017, the Department of Energy released an additional consent-based siting document and initiated a public comment period.

[22] *See Dolan v. United States*, 560 U.S. 605, 610 (2010) ("The expiration of a 'jurisdictional' deadline prevents the court from permitting or taking the action to which the statute attached the deadline. The prohibition is absolute. The parties cannot waive it, nor can a court extend that deadline for equitable reasons."); *Colbert v. Brennan*, 752 F.3d 412 (5th Cir. 2014) ("Because this is a jurisdictional issue, it cannot be waived or forfeited. Additionally, no equitable exception can overcome this jurisdictional defect." (citation omitted)).

No. 17-60191

## III.

In recent years, the Supreme Court has increasingly turned its attention toward distinguishing statutory requirements implicating the subject matter jurisdiction of federal courts from ones that only function as "claim-processing" rules.[23] The former—so-called jurisdictional limitations—are "strong medicine for litigants, attorneys, and judges alike,"[24] for with a want of subject matter jurisdiction, the court is "deprive[d] . . . of all authority to hear a case"[25]: it must dismiss the case irrespective of equitable considerations, and it must do so even when timeliness arguments have been waived.[26] On the other hand, the latter—claim-processing rules—simply "promote the orderly process of litigation by requiring that the parties take certain procedural steps at certain specified times."[27] As they do not stake out limits on a federal court's subject matter jurisdiction, their application may be tempered by considerations such as equity and waiver.[28]

Given the bite of jurisdictional rules, and their elusive and protean character, "Congress must do something special" to mark a procedural requirement as jurisdictional.[29] This has come to resemble a clear statement rule: Congress need not "incant magic words," but "traditional tools of statutory construction must *plainly show* that Congress imbued a procedural bar with jurisdictional consequences."[30] The clear statement requirement here disciplines the dialogue with Congress, akin to the rule deployed in resolving

---

[23] *See, e.g.*, *United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1632 (2015); *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013); *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011); *Kontrick v. Ryan*, 540 U.S. 443, 454 (2004).

[24] *Herr v. U.S. Forest Serv.*, 803 F.3d 809, 814 (6th Cir. 2015).

[25] *Kwai Fun Wong*, 135 S. Ct. at 1631.

[26] *See id.*

[27] *Shinseki*, 562 U.S. at 435.

[28] *See Bowles v. Russell*, 551 U.S. 205, 216 (2007).

[29] *Kwai Fun Wong*, 135 S. Ct. at 1632.

[30] *Id.* (emphasis added) (quoting *Auburn Regional*, 568 U.S. at 153).

claims of congressional abrogation of states' Eleventh Amendment immunity;[31] it is also reminiscent of the Court's demand for clarity that has ebbed and flowed with enforcement of congressionally created norms by judge-made private rights of action not provided by Congress.[32] The common thread is the exercise of weighty power belonging only to Congress.[33] And because it is weighty, we require that Congress speak clearly when it chooses to wield such power, mindful of the congressional authority's potential impact upon important constitutional values.

Against this backdrop, we ask whether "traditional tools of statutory construction" demonstrate with sufficient clarity that the Waste Act's 180-day deadline is jurisdictional. As Nevada reminds us, 42 U.S.C. § 10139 does clearly speak of jurisdiction. It does so in subsection (a), the provision outlining the subject matter bases for civil actions that it entrusts to courts of appeals' "original and exclusive jurisdiction."[34] Well enough, but the 180-day deadline is located in a *different* subsection, mundanely labeled "[d]eadline for commencing action."[35] While the fact that 42 U.S.C. § 10139 does speak in jurisdictional terms in one provision could plausibly support an inference that the deadline, too, is meant to serve jurisdictional purposes, the Court "has

---

[31] *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984) ("[A]lthough Congress has power with respect to the rights protected by the Fourteenth Amendment to abrogate the Eleventh Amendment immunity, we have required an unequivocal expression of congressional intent to 'overturn the constitutionally guaranteed immunity of the several States.'" (citations omitted)).

[32] *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 749 (1979) (Powell, J., dissenting) ("[W]e should not condone the implication of any private action from a federal statute absent the most compelling evidence that Congress in fact intended such an action to exist.").

[33] *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress. The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." (citation omitted)).

[34] 42 U.S.C. § 10139(a)(1).

[35] *Id.* at § 10139(c).

often explained that Congress's separation of a filing deadline from a jurisdictional grant indicates that the time bar is not jurisdictional."[36] And that is the situation in the Waste Act: 42 U.S.C. § 10139(c), the filing deadline, is separated from 42 U.S.C. § 10139(a)(1), the jurisdictional grant.

The Waste Act's deadline provision does cross-reference the jurisdictional grant.[37] But the jurisdictional grant is not explicitly "condition[ed] . . . on the limitations period[]."[38] And while the deadline is framed in mandatory terms, the Court has held that this is simply not enough to mark out a procedural rule as jurisdictional.[39] Finally, we are aware of nothing in the legislative history of the Waste Act that suggests that the limitation is jurisdictional.[40] In the face of these facts, we are persuaded that Congress has not sufficiently clearly indicated that the deadline imposed by 42 U.S.C. § 10139(c) is jurisdictional.

It is true that several courts in the past have generically described "section 119" of the Waste Act, or 42 U.S.C. § 10139, as jurisdictional.[41] But these courts have never held that *the deadline provision* is jurisdictional. The D.C. Circuit's description of the 42 U.S.C. § 10139 as jurisdictional came during

---

[36] *Kwai Fun Wong*, 135 S. Ct. at 1633 (collecting cases).

[37] 42 U.S.C. § 10139(c) ("A civil action for judicial review described under subsection (a)(1) of this section may be brought not later than the 180th day after the date of the decision or action or failure to act involved . . . .").

[38] *Kwai Fun Wong*, 135 S. Ct. at 1633.

[39] *See id.* at 1632 (holding that the mandatory—and emphatic—nature of a procedural rule is "of no consequence" to question of whether the rule is jurisdictional).

[40] *See, e.g.*, H.R. Rep. No. 97-491(I), at 57 (1982) ("Section 119(c) provides that civil actions for judicial review described under this section may be brought not later than the 180th day after the date of the action or decision or failure to act involved.").

[41] *See Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1286–87 (D.C. Cir. 2004) ("Statutes providing for judicial review, including section 119 of the NWPA, 'are jurisdictional in nature and must be construed with strict fidelity to their terms.'" (citation omitted) (quoting *Stone v. INS*, 514 U.S. 386, 405 (1995))); *see also PSEG Nuclear, LLC v. United States*, 465 F.3d 1343, 1349 (Fed. Cir. 2006) ("The NWPA contains only one jurisdictional provision, section 119.").

its examination of the scope of 42 U.S.C. § 10139(a)(1)—the provision that, again, expressly speaks of courts of appeals' "original and exclusive jurisdiction."[42] And the Federal Circuit—despite once describing "section 119" as jurisdictional—has since reserved judgment on whether *the deadline provision* limits courts' subject matter jurisdiction.[43] Neither court has answered the question of whether the deadline listed in 42 U.S.C. § 10139(c) imposes a limit on our subject matter jurisdiction or operates as a more workaday claim-processing rule.[44] These decisions also preceded the Supreme Court's most recent guidance on the topic—and the Supreme Court "has [since] been on a mission to rein in profligate uses of 'jurisdiction,'"[45] in order to bring discipline to our dialogue with Congress, the ultimate repository of power here.

Because we conclude that the deadline in 42 U.S.C. § 10139(c) is not jurisdictional, we proceed to consider whether the continuing violations doctrine may apply to Texas's claims.

## IV.

The continuing violations doctrine embodies a "muddled," difficult body of law that has long bedeviled courts and commentators alike.[46] The doctrine

---

[42] *See Nuclear Energy Inst., Inc.*, 373 F.3d at 1287 (focusing on the meaning of the Waste Act's "under this part" language).

[43] *See Neb. Pub. Power Dist. v. United States*, 590 F.3d 1357, 1368 n.10 (Fed. Cir. 2010) ("Setting aside whether the statute of limitations for a judicial review proceeding under section 119(c) is jurisdictional in nature, there is no merit to the government's argument.").

[44] *See Kwai Fun Wong*, 135 S. Ct. at 1632 (observing that most filing deadlines operate as claim-processing rules).

[45] *Herr*, 803 F.3d at 813.

[46] *See, e.g.*, *Earle v. District of Columbia*, 707 F.3d 299, 306 (D.C. Cir. 2012) ("Th[e continuing violations] doctrine is 'muddled,' 'intricate and somewhat confusing,' . . . ." (citations omitted)); *Glass v. Petro-Tex Chemical Corp.*, 757 F.2d 1554, 1560 (5th Cir. 1985) ("On at least three occasions, we have stated that the case law on the subject of continuing violations is inconsistent and confusing." (internal quotation and alterations omitted)); James R. MacAyeal, *The Discovery Rule and the Continuing Violation Doctrine as Exceptions to the Statute of Limitations for Civil Environmental Penalty Claims*, 15 Va. Envtl. L.J. 589, 623 (1996) ("It is not clear whether the continuing violation doctrine is a rule of accrual or a rule of tolling.").

takes two different forms that may plausibly render Texas's claims under the Waste Act timely. First, the doctrine has been used as a tolling mechanism that forestalls the running of a statute of limitation in the appropriate circumstances. This reflects the way in which the vast majority of the cases in this Circuit have understood the doctrine.[47] However, courts have also used the continuing violations doctrine as an apparent shorthand for an exercise in statutory interpretation; in this incarnation, the continuing violations doctrine applies when a court determines that a statute or regulation is most naturally read as treating injuries as ongoing or continually accruing.[48] Applying either of these versions of the continuing violations doctrine, we conclude that most of Texas's claims are untimely.

## A.

In its form most commonly deployed in our Circuit, "[t]he continuing violations doctrine is equitable in nature and extends the limitations period on otherwise time[-]barred claims."[49] We have dealt with this version most frequently in the employment discrimination context, though we have recognized its potential applicability in other areas of law as well.[50] The

---

[47] *See, e.g.*, *Doe v. United States*, 853 F.3d 792, 801 (5th Cir. 2017) (considering application of continuing violations doctrine as inquiry into whether "equitable tolling is appropriate").

[48] *See Interamericas Invs., Ltd. v. Bd. of Gov'rs*, 111 F.3d 376, 382 (5th Cir. 1997) ("Here, the BHCA [Bank Holding Company Act] has more than per diem penalties; as emphasized above, it refers to 'continuing violations[.'] Furthermore, the BHCA uses the present tense in describing the offenses, making reasonable reading it as contemplating continuing violations.").

[49] *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 279 (5th Cir. 2004); *see also Noack v. YMCA of Greater Hous. Area*, 418 Fed. App'x 347, 351 (5th Cir. 2011) (per curiam) ("The continuing-violation exception is an equitable doctrine that extends the limitations period on otherwise time-barred claims . . . .").

[50] *Compare Heath v. Bd. of Sup'rs*, 850 F.3d 731, 737 (5th Cir. 2017) (describing the continuing violations doctrine as applying "when a plaintiff alleges a hostile work environment claim"), *with Doe*, 853 F.3d at 801–802 (applying the continuing violations doctrine to lawsuit against the United States under 28 U.S.C. § 2401(a)).

No. 17-60191

Supreme Court has stressed that the equitable version of the doctrine should be invoked "sparingly," only when the situation calls for it.[51] We have heeded this instruction: as we have repeatedly held, "[g]enerally, in determining if equitable tolling is appropriate, we focus the inquiry 'on what event, in fairness and logic, should have alerted the average lay person to act to protect his rights.'"[52]

This test aligns strikingly well with the sole exception that Congress drafted directly into the Waste Act's deadline provision, which provides that a party may avoid the strictures of the 180-day deadline if it can show that it was subjectively unaware of the complained-of actions and that its lack of knowledge was objectively reasonable in the circumstances.[53] But under the Waste Act's exception, this justifiable ignorance only earns the party an extra 180 days from when it *does* finally learn of the government's actions.[54] The fact that Congress already considered the situation in which we apply equitable tolling and crafted its own safety valve provides reason to tread cautiously.

In any event, Texas points to federal actions that, "in fairness and logic," should have alerted it to act years ago. The fact that the government failed to collect waste by the statutory deadline in 1998 has no doubt been obvious for some time, since Texas itself is the current, unhappy possessor of that waste; the Nuclear Regulatory Commission's failure to complete the Yucca Mountain licensing proceeding by 2012 has already spawned two very public lawsuits, as

---

[51] *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("Courts may evaluate whether it would be proper to apply such [equitable tolling] doctrines, *although they are to be applied sparingly*." (emphasis added)); *Doe*, 853 F.3d at 802; *Cherosky v. Henderson*, 330 F.3d 1243, 1248 (9th Cir. 2003) ("The Supreme Court has made clear, however, that the application of the continuing violations doctrine should be the exception, rather than the rule. We are not free to depart from this directive.").

[52] *Doe*, 853 F.3d at 802 (quoting *Messer v. Meno*, 130 F.3d 130, 135 (5th Cir. 1997)).

[53] 42 U.S.C. § 10139(c).

[54] *Id.*

13

No. 17-60191

outlined above; and the Department of Energy's consent-based siting activities have resulted in public documents and public comment periods. In the face of such paradigmatically public acts, and bearing in mind the Court's instruction that the doctrine must be used "sparingly," this lawsuit simply does not present a situation in which our equitable tolling version of the continuing violations doctrine should apply.

**B.**

We have occasionally applied a slightly different version of the continuing violations doctrine, which more closely resembles a classic exercise in statutory interpretation.[55] We have invoked this second version of the doctrine in interrogating whether the text of a particular statute, understood in the appropriate context, "contemplates a continuing violation theory" of claim accrual.[56]

At least two of our previous cases have applied this approach in an administrative setting. In *Interamericas Investments*, we considered whether the Bank Holding Company Act allows for a continuing violations theory, such that "a new claim accrues each day the violation [of the statute] is extant" and that the statute of limitations is appropriately calculated from the latest violation.[57] We concluded that it does, and our path to that conclusion depended on the text of the statute as well as the relevant agency's interpretation, which we held to be entitled to deference.[58] In *Newell Recycling*

---

[55] *See Earle*, 707 F.3d at 307 (alluding to "a second application of the continuing violation doctrine if the text of the pertinent law imposes a continuing obligation to act or refrain from acting").

[56] *Interamericas Invs., Ltd.*, 111 F.3d at 382.

[57] *See id.*

[58] *See id.* ("[T]he BHCA is entrusted to the Board; therefore, that interpretation is due the deference demanded by [*Chevron*]. To hold other than that a continuing violation is allowed in this instance would be contrary not only to our precedent, but also to the plain language of the BHCA and the Board's interpretation of it." (citation omitted)).

*Co. v. EPA*, we cited to *Interamericas Investments* in briefly analyzing the EPA's interpretation of "improper disposal" under the relevant regulatory scheme. We affirmed the EPA's continuing violations theory of accrual on the basis of that interpretation.[59]

One clear distinction between those two cases and the one before us now is that we have no administrative interpretation holding that a continuing violations theory of accrual is appropriate under the Waste Act. Thus, our examination must begin and end with the statutory text—and this text suggests that Texas's continuing violations theory of accrual is not available. The Waste Act provides that civil actions "alleging *the failure of the [government] to make any decision, or take any action*, required under this part" are subject to the 180-day statute of limitations.[60] The statute then explicitly provides that a civil action "may be brought not later than the 180th day after the date of the . . . *failure to act* involved," repeatedly including the phrase "failure to act" when describing the deadline.[61] By its plain language, the Waste Act treats failures to act as subject to its deadline. And by its plain language, the Waste Act speaks of failures to act as discrete events, not as ongoing, durational conditions.[62]

But under Texas's continuing violations theory, this language would be rendered practically meaningless. Almost all "failure[s] to act" would be ongoing by definition, and would be immunized from the 180-day deadline that

---

[59] *See Newell Recycling Co. v. EPA*, 231 F.3d 204, 206–207 (5th Cir. 2000).

[60] 42 U.S.C. § 10139(a)(1)(B) (emphasis added).

[61] *Id.* § 10139(c) (emphasis added).

[62] *Compare id.* ("A civil action for judicial review described under subsection (a)(1) of this section may be brought not later than the 180th day *after the date of the . . . failure to act involved . . . .*" (emphasis added)), *with* 12 U.S.C. § 1847(b)(1) ("Any company which violates, and any individual who participates in a violation of, any provision of this chapter, . . . shall forfeit and pay a civil penalty of not more than $25,000 for each day *during which such violation continues.*" (emphasis added)).

No. 17-60191

Congress provided. Because the statute *expressly sets dates* for the government's actions that Texas complains have yet to occur, the more natural reading of the statute is that 180-day timer runs from those dates—1998 for the Department of Energy's receipt of waste from the states, and 2012 for Nuclear Regulatory Commission's completion of the Yucca Mountain licensing procedure.[63]

Texas's proposed application of the continuing violations doctrine would also invite litigants to short-circuit the Waste Act's timeliness requirement by framing claims in "failure to act" terms, just as Texas has done in this case. As the Nuclear Regulatory Commission points out, after the *Aiken II* decision, it has been mostly devoting what public funds it has left to producing a Safety Evaluation Report, a necessary precursor to eventually resolving the licensing application and thus a part of the overall licensing process. But Texas frames this decision as a continuing *failure to act*, rather than a decision to act in a particular way that it does not like.[64]

The scale of the statute of limitations also bespeaks a congressional purpose to limit civil actions to the ones occurring in the immediate aftermath of a particular Waste Act–related decision by the government. Congress has

---

[63] *See* 42 U.S.C. § 10134(d) ("[T]he Commission shall issue a final decision approving or disapproving the issuance of a construction authorization not later than the expiration of 3 years after the date of the submission of such application, except that the Commission may extend such deadline by not more than 12 months [i.e., by June 2012] . . . ."); 42 U.S.C. § 10222(a)(5)(B) ("[I]n return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subchapter."); *see also Public Citizen v. NRC*, 845 F.2d 1105, 1108 (D.C. Cir. 1988) ("We have some doubts about the argument [that agency failures to act extend the Waste Act's deadline for claims indefinitely] even as a general matter.").

[64] The D.C. Circuit, examining the Waste Act's timeliness requirement several decades ago, explained that "[a]lmost any objection to an agency action can be dressed up as an agency's failure to act," and that to allow petitioners to simply frame their claims as such and apply a different statute of limitations on that basis would be to "make a nullity of statutory deadlines." *See id.*

pegged the appropriate period as approximately half of a year; yet under Texas's approach, decisions made roughly *twenty years ago* would be open to challenge today. It is beyond our compass to graft either version of the continuing violations doctrine onto the Waste Act's deadline provision. Texas generally points to actions and omissions that passed far more than 180 days ago; we must conclude that the bulk of its arguments are untimely, an outcome that aligns comfortably with the congressional view that to do otherwise would take the third branch into the middle of a most sensitive and delicate accommodation of the competing interests of the several states, here a quintessential political endeavor laced with strictures of science not subject to decision by votes.

## V.

Texas does complain of two actions that occurred within the Waste Act's 180-day limitation period: it points out that the Department of Energy disseminated a January 2017 policy document and subsequently engaged in a several-months-long formal comment period concerning consent-based siting for waste disposal. But of course, the Waste Act also specifically limits our review to "*final* decision[s] or action[s]" undertaken by the government."[65]

In *Aiken I*, the D.C. Circuit specifically rejected the argument that a Department of Energy policy announcement, "which has no legal consequence," could constitute a "final decision or action" subject to challenge,

---

[65] 42 U.S.C. § 10139(a)(1)(A) (emphasis added); *see also Nuclear Energy Inst., Inc.*, 373 F.3d at 1287 ("We have no quarrel with the commonsensical proposition that section 119 [of the NWPA] brings within judicial purview only those final agency actions embraced by the express language of the NWPA."). At one point, Texas attempts to cast these, too, as examples of agency inaction, but Texas's concern is with *discrete actions* that it thinks are statutorily barred. *See Pub. Citizen*, 845 F.2d at 1107–08 (rejecting the argument that "the mere issuance of a policy statement could not start the time clock running" because it represents an "*ongoing* failure," not a discrete action).

No. 17-60191

as required by the Waste Act.[66] That is what the January 2017 policy document appears to be: a policy document with "no legal consequence," and which Texas has no basis to challenge under the Waste Act.

Relatedly, *Texas v. U.S. Department of Energy* explained that we "interpret 'finality,' as that concept is used in the Administrative Procedure Act, in a 'pragmatic way,' and that approach is appropriate here[, in the Waste Act context,] as well."[67] Certainly under the Administrative Procedure Act, the draft policy document and accompanying solicitation of public comments would not constitute final agency actions. Indeed, in that context, the Supreme Court has instructed us that finality has two components: "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"[68] The dissemination of a draft policy contemplating consent-based siting and the solicitation of comments on that policy satisfy neither of the Administrative Procedure Act's two finality prongs. For that reason, we lack jurisdiction to consider the Department of Energy's 2017 consent-based siting activities—the sole activities falling within the Waste Act's permissible timeliness range—as they are not sufficiently final under the statute.

## VI.

We hold that Texas's claims do not satisfy the statutory requirements of timeliness or finality, and we therefore must dismiss them.

---

[66] 645 F.3d at 437.

[67] 764 F.2d 278, 282 (5th Cir. 1985) (citation omitted) (quoting *Pennzoil Co. v. FERC*, 645 F.2d 394, 399 (5th Cir. 1981)).

[68] *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted) (quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948), and *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).